INMATES OF the ALLEGHENY COUNTY JAIL, Thomas Price Bey, Arthur Goslee, Robert Maloney, and Calvin Milligan on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Robert PEIRCE, Chairman, Allegheny County Board of Prison Inspectors and all other members of the Board, James Jennings, Warden Allegheny County Jail; and James Flaherty, Robert Peirce and Thomas Foerster, Commissioners for Allegheny County, Defendants.

Civ. A. No. 76–743.

United States District Court,
W. D. Pennsylvania.

April 17, 1980.

Jere Krakoff, Neighborhood Legal Services, Pittsburgh, Pa., for plaintiffs.

Dennis Biondo, Pittsburgh, Pa., for defendants.

## OPINION AND ORDER

COHILL, District Judge.

This civil rights class action under 42 U.S.C. § 1983 was filed in 1976 by inmates of the Allegheny County Jail challenging allegedly unconstitutional conditions at the jail. After a lengthy trial, this Court concluded that many of the deficiencies at the jail arose to the level of constitutional violations. Opinions and orders were entered on January 4, 1978, and October 11, 1978. *See Owens-El v. Robinson,* 442 F.Supp. 1368 (W.D.Pa.1978) and 457 F.Supp. 984 (W.D. Pa.1978).

On appeal to the United States Court of Appeals for the Third Circuit, the inmates challenged, *inter alia,* our failure to order psychiatric care for inmates in the jail. *Inmates v. Peirce,* 612 F.2d 754 (3d Cir. 1979). In the first opinion in this case I wrote:

> We cannot, in good conscience, ·write this Opinion without commenting on the lack of mental health treatment facilities in this community for persons such as the inmates of the jail. There is no suitable arrangement within the jail for dealing with violent, acting-out mentally unstable inmates. Neither are we aware of any mental health facility in the community with the capacity to deal with such unfortunate people.
>
> It became obvious during the trial that there is difficulty, indeed, perhaps tension, between jail personnel and "outside" mental health personnel in handling such persons. While ordering the creation of such a facility in the community would be going beyond the parameters of the case before us, we are compelled to .comment that the absence of such facilities is noteworthy, and we strongly suggest that the appropriate authorities at the federal, state and local levels seek to provide such a facility before a tragedy occurs.

442 F.Supp. at 1381.

The Court of Appeals agreed that conditions at the jail were proved to be "shockingly substandard," but disagreed with this Court's assumption that we lacked authority to order psychiatric facilities be implemented at the jail. Judge Rosenn, recognizing the well-established right of prisoners to access to medical care, wrote that "we perceive no reason why psychological or psychiatric care should not be held to the same standard." 612 F.2d at 763. Re-

manding the case for further consideration, the Court of Appeals assigned four tasks:

1) to determine whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances;

2) to determine any change in conditions caused by this Court's prior Order;

3) to make a specific finding as to the adequacy of the present system for psychiatric care at the jail;

4) to determine what changes, if any, are necessary to meet the constitutional standards of care enunciated by the Third Circuit.

We have pursued these tasks during the course of a five-day non-jury trial on the matter, and now enter findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure Rule 52.

### Findings of Fact

The Allegheny County Jail is a criminal detention facility located in Pittsburgh, Pennsylvania, housing primarily pre-trial detainees. It has an average daily population of 450 to 500 inmates.

Several jail guards, a nurse, and a senior staff psychiatrist doing consultant work for the jail testified from personal knowledge about the conditions within the jail. All agreed, and we find as a fact, that this jail is persistently understaffed, disorganized, and unsafe for employees and inmates alike. The good work that these individuals do is thwarted by the chaotic conditions within the jail. Dr. Herbert Thomas, a psychiatrist with long experience in corrections and years of association with the Allegheny County Behavior Clinic doing evaluations of inmates, rated the jail as a correctional facility at "Z minus" on a scale of A to Z during his testimony before this Court. Several employees testified that a single guard may be working one cell block on the day shifts, despite an earlier order of this Court that two guards be assigned to each cell block. *Owens-El v. Robinson, supra,* 457 F.Supp. at 988–89.

Several inmates also testified about conditions at the jail; their reports were very similar to those of the jail employees. One articulate and highly credible inmate testified that during the last two months at the jail, he had personally witnessed four separate beatings of inmates by other inmates; the victims in these instances were classified by the witness as "mentally ill." One incident involved a recent admittee to the jail who was filthy and foul-smelling and who was assaulted by a group of inmates in the cafeteria. The witness believed, and we must agree, that there is no place in the jail where inmates unable to defend themselves are safe.

All the employees and inmates described a similar and wide-range of behavior in the jail which points to mental illness of many inmates. One guard testified that there have been about ten suicide attempts in the last six months and two successful suicides in the first three months of 1980. Several episodes were described of inmates obsessed with their own excrement: they decorate themselves, their cells, and others around them with their own wastes or drink their urine. One inmate who is on the clean-up crew testified that these inmates are sometimes hosed down with cold water during the hosing down of the cell block. Other inmates are obviously hallucinating, talking to themselves or non-existent persons. There are frequent incidents of all-night singing, shouting, or "music"-making by inmates who cannot be calmed or quieted. Some inmates appear dazed, incoherent or disoriented to jail employees; others the guards recognize as suffering from delirium tremens. There is a lot of fire-setting, some of it to human hair or clothing. There have been instances of self-mutilation. Some of the "disturbed" inmates become violent; one guard had his hand broken by an inmate in the psychiatric section of the hospital and another was choked by an inmate later admitted to Mayview State Hospital. More often, however, the inmates who act confused or strange are the victims of abuse rather than abusers. According to jail employees, these inmates

have been assaulted with fists, broom handles, and even hospital beds. The "normal" inmates throw burning objects into their cells, pour water on them, and generally taunt or tease them. They are vulnerable rape victims. The stipulations of counsel admitted as exhibits provide gruesome case histories of such incidents.

There are three places where inmates with suspected mental problems may be housed in the jail—in the hospital, in the selective housing unit ("SHU"), or in the general population. Generally, an inmate with mental problems is not placed in the hospital unless he "has done something to draw attention to himself," in the words of the officer in charge of the hospital, or unless he requires restraints. However, inmates with delirium tremens are placed in the hospital, usually in restraints. (Our prior order of October 11, 1978 directed that any inmate suffering delirium tremens be immediately transferred to a medical facility outside the jail. *Owens-El v. Robinson, supra,* 457 F.Supp. at 991.)

The term "hospital" is a misnomer as used at the jail. We have personally visited this area on more than one occasion, the most recent being April 14, 1980. The hospital area consists of two rooms, the so-called "square room" and the "round room" connected by a doorway. The round room is, indeed, circular with a diameter of approximately thirty feet. It contains about twenty cots lined up around the circle with feet toward the center and heads to the wall. There are no partitions between the cots. This room is used for prisoners who have medical illnesses of various types. The square room is really rectangular and is used to house inmates with mental illnesses and those requiring restraints. The part occupied by beds is approximately fifteen feet by thirty feet with an aisle down the middle; there are about seven cots on each side. At one end is a glass partition with two more cots behind it. Other than the glass partition at the end, there are no other partitions, and patients who are in restraints are lying beside others who may be permitted to move around. The medical records indicate that sometimes inmates are kept in restraints in the square room for as long as three weeks.

Most inmates who are believed to have mental problems are housed on the B and D ranges of the SHU. Also housed in these areas are juveniles, prisoners under witness protection programs, and rapists isolated from the general population. When the Court visited the jail in January of this year, the cells in the B range of the SHU were without lighting, despite this Court's earlier ruling, 457 F.Supp. at 989, and many were without cots. There was testimony at trial that these conditions had persisted for several months and that the inmates in these cells were transferred to the hospital the evening before my visit. Because there are few beds available in the hospital unit and because the SHU houses various categories of inmates, there are always some inmates who appear to be mentally disturbed housed in the general population.

It is difficult to pinpoint the number of inmates with serious mental health problems. Two experts in the field predicted that any urban jail is likely to have a 20% to 30% population of seriously mentally ill inmates. A jail nurse, who was otherwise careful and quite credible in her testimony, estimated that 30 to 40% of the inmates are disturbed enough to be categorized as seriously ill. The most conservative figure was 5%, supplied by an expert familiar with populations in long-term prisons and who readily agreed to 10% for a county jail setting. There was also testimony indicating that the numbers of mentally ill individuals in jails has increased dramatically in recent years as civil mental health commitments have become more stringent; this is indeed an ironic result of mental health procedural acts passed for the protection of individual liberties. In other words, to avoid the procedural safeguards now mandated for civil commitments, many families having a mentally ill member will have him arrested and taken to jail. Given the range in the testimony and the difficulties of definition, we find only that a significant proportion, perhaps as many as a quarter to a third, of the inmates being admitted to the

county jail are within the commonly-understood medical, if not always legal, category of seriously mentally ill.

Despite the nature and size of the mental health problem in the jail, there is no system to respond to it. There is no psychiatrist on the jail staff. (The Behavior Clinic, which does evaluations of certain categories of inmates at the direction of the criminal court, will see other inmates at times as a "courtesy" to the jail; however, its work is diagnostic only). There is one part-time medical doctor on the jail staff who spends approximately three hours per day at the jail and sees both medical and psychiatric patients in the jail hospital. There are six registered nurses on the jail staff, but there is usually only one nurse on duty on any shift; there are also occasions when no nurse is on duty. All the nurses on staff have not received the specific training previously ordered by this Court. *Owens-El v. Robinson*, 457 F.Supp. at 991. There is no psychologist or psychiatric social worker on the staff.

There is no screening system for new admittees to identify those with mental health problems, those who need protection, or those who are potentially dangerous to themselves or others. There is no observation or diagnostic center for new inmates. There is no segregation of seriously disturbed inmates on a systemic basis.

Medical records contain few, if any, diagnoses of mental illnesses. Although medication is prescribed by the jail doctor or recommended by psychiatrists at the Behavior Clinic, there is insufficient monitoring and reevaluating of medication. Nurses disburse medications to those inmates who show up at the office during sick call. Naturally, many inmates do not appear routinely for medication. Occasionally, guards dispense medication, and there was at least one incident of a guard injecting medicine intermuscularly. When a crisis occurs, the doctor may prescribe a psychotropic drug by telephone without seeing the inmate.

Referrals are made for court commitments to mental hospitals, but there are frequently delays in transferring inmates following commitment.

Following all these deficiencies to their logical conclusion we find as a matter of fact that the care of the mentally ill in the Allegheny County jail is woefully inadequate. In so finding, we adopt the opinions of three experts in the field of mental health and corrections, including the expert called by the defendants.

Psychiatric experts also described the necessary components of adequate mental health care in an urban jail. Dr. Edward Guy, Director of Psychiatric Services for the Philadelphia prison system and Dr. Steven Friedman, Administrator of the Psychiatric Unit in the Cuyahoga County Jail, Cleveland, Ohio, explained how inmates are processed and maintained in their respective facilities. The Philadelphia jails house about five times as many inmates as the Allegheny County jail. That system operates with two full-time and eight part-time psychiatrists, four full-time psychologists, approximately 16 nurses in the psychiatric unit, ten psychiatric social workers and three therapists. All inmates coming into the jail are screened on admission; those with serious mental problems are housed in a separate unit; a small proportion receive short-term but "vigorous" treatment in a psychiatric hospital ward. The Cuyahoga County Jail, with an inmate population of about 790, employs three part-time psychiatrists, a full time psychologist, a full-time drug counselor, four psychiatric nurses, and two therapists—all in addition to its regular medical and security staff. The Cuyahoga facility does not attempt to "treat" mentally ill inmates but rather to maintain and manage them during incarceration. It has a screening system at admissions and special housing for the mentally ill. The use of screening for psychiatric problems as an early warning system is common in local jails. *See, Kenny v. Warden, Richmond City Jail*, 476 F.Supp. 197 (E.D.Va.1979) (inmate promptly evaluated by psychiatrist and transferred to state hospital for evaluation).

We conclude that inmates in Allegheny County are denied reasonable access to psychiatric diagnosis and care.

All the experts agreed, and we find, that there is no system for care of mentally ill inmates in the jail and that the haphazard and inconsistent care and protection now being afforded is far below minimum standards. The deficiencies in immediate care result in physical danger to the ill inmates and to others, create security problems in the jail, aggravate-rather than alleviate-the conditions of many of the most seriously ill, and contribute to the chaotic environment in the jail.

### Conclusions of Law

■ Pretrial detainees are constitutionally entitled to psychological or psychiatric attention for serious mental or emotional illness just as they would be for serious medical problems. *Inmates v. Peirce,* 612 F.2d 754 (3d Cir. 1979). the adequacy of care must be measured against the standards of *Estelle v. Gamble,* 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976): the medical needs must be serious and there must be "deliberate indifference" on the part of responsible officials. There is no doubt in this case that the needs of the inmates are critical. Thus, the first test is met.

"Deliberate indifference" has been defined variously. Denial of access to needed medical care, including denial of access to a physician capable of evaluating the illness, has been construed as deliberate indifference. *West v. Keve,* 571 F.2d 158 (3d Cir. 1978).

Systematic deficiencies in staffing have in several cases been held to effectively deny access and thus constitute deliberate indifference. *E. g., Newman v. Alabama,* 349 F.Supp. 278 (M.D.Ala.1972), aff'd, 503 F.2d 1320 (5th Cir. 1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975) (gross understaffing of medical facilities held unconstitutional); *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir. 1977) ("systematic deficiencies . . . make unnecessary suffering inevitable"). In remanding the instant case, the Third Circuit suggested that the exercise of informed professional judgment may be "precluded by the *patently inadequate* size of the staff" 612 F.2d at 763. (emphasis added).

In the *Todaro* case, *supra,* the Second Circuit held that delays in treatment, poor record-keeping, and "gross misadministration" of jail facilities combined to prevent access to constitutionally-mandated care. *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir. 1974), found the denial of medically recommended treatment to meet the standard requiring court intervention.

■ The conditions described in this opinion meet all of the legal tests just reviewed. The provision of care to mentally ill inmates in the Allegheny County Jail is inadequate to the extent of "deliberate indifference."

The Commonwealth of Pennsylvania has a duty to care for its mentally ill residents. The jail is not a mental health facility; nor do we intend that it become one. However, it must be organized and staffed to meet emergency situations, to make appropriate referrals, and to properly care for and protect those who must be housed in the jail for whatever reasons despite their mental illness.

■ The Court has broad, equitable powers to make whatever order is required in this case to remedy the constitutional violations found. *Inmates v. Peirce,* 612 F.2d at 763; *Bishop v. Stoneman,* 508 F.2d 1224 (2d Cir. 1974); *Ramos v. Lamm,* 26 Cr.L. 2380 (E.D.Colo.1979).

### ORDER

■ Now, this 17th day of April, 1980, IT IS ORDERED, ADJUDGED and DECREED that:

#### I.

No inmates shall be housed in the Allegheny County Jail after June 17, 1980 unless the defendants cause the following to occur within 60 days of the date of this order (on or before June 16, 1980):

A. All terms of this Court's Order of October 11, 1978 shall be fully implemented.

B. There shall be at least one nurse on *every shift* at the jail. A system shall be

devised so that a nurse will always be available to substitute for a regularly-scheduled nurse who becomes ill or for some other reason does not report for work.

C. An administrator shall be hired by Allegheny County to establish (1) a program for identifying and segregating from the general population those inmates in need of care or protection due to mental illness and (2) for implementing the provisions in Section II of this Order. Such administrator may not at the same time be employed by the Behavior Clinic, shall be subject to approval by the Court, shall be answerable to the Court, and shall make written reports to the Court on or before the following dates: July 3, 1980; September 3, 1980; November 3, 1980; February 3, 1981; and May 4, 1981. Although answerable to the Court, the administrator will be expected to cooperate with the jail physician. The administrator shall have any of the following credentials: (1) Board Certification in Psychiatry with experience in corrections or at a state mental hospital; or (2) a Ph.D. in Clinical Psychology with three years experience in corrections or at a state mental hospital; or (3) a Masters degree in Social Work with five years experience in psychiatric social work. This may be a part-time position but no less than 15 hours per week. Within three weeks after hiring, but no later than July 3, 1980, the administrator shall make written recommendations to the Court on further staff necessary to implement this order.

D. There shall be established within the jail a reception and screening center where all new admittees will be seen by appropriate jail personnel, including a nurse, and where a medical and psychiatric history shall be taken. All new admittees to the jail shall be housed in the reception unit for a minimum of 48 hours following admission.

E. If qualified medical personnel at the jail determine that an inmate should be transferred to a mental health institution rather than remain confined at the jail, appropriate proceedings shall be instituted within 72 hours of that decision.

II.

No inmates may be housed in the jail after August 16, 1980, unless the defendants cause the following to occur within 120 days of the date of this order (on or before August 15, 1980):

A. An area separate from the general jail population shall be established to house: (1) inmates who, in the view of the medical or psychiatric staff, are seriously disturbed and require observation, protection, or restricted confinement to prevent harm to themselves or others; (2) inmates who have been committed to mental institutions and are awaiting transfer; and (3) inmates who are receiving psychotropic medication and who, in the view of the medical or psychiatric staff, require observation or monitoring. The details for implementing this provision, and the mental health unit's relation to the existing hospital, shall be within the discretion of the new administrator.

B. Two psychiatrists shall be hired, each on a part-time basis, but so that one shall always be on call for emergencies. The psychiatrists shall be independent of the Behavior Clinic and shall be employees of the jail. It will be their responsibility to prescribe and monitor psychotropic medication of inmates, to enter diagnoses on medical charts, and to make recommendations to the jail on the appropriate placement of inmates within or outside the jail.

C. In addition to the staffing requirements of our previous orders at least one guard and one nurse shall be assigned to the mental health housing unit for each shift. At no time shall the mental health housing unit be left unguarded.

D. The administrator, in cooperation with the warden, shall establish and reduce to writing systems consistent with this opinion for handling the following procedures at the jail:

1. dispensing of medication;
2. effective and expeditious diagnosis of inmates showing symptoms of mental illness;
3. a means of caring for mentally ill inmates who are not committable to

mental institutions but who must remain at the jail;

4. a method for record-keeping for inmates housed in the reception area and mental health unit;

5. a system for transferring patients with *delirium tremens* promptly to appropriate facilities;

6. means of responding effectively to emergency situations involving mentally ill inmates.

### III.

As of the date of this Order,

A. All medication shall be dispensed by nurses or other qualified personnel;

B. No medication shall be dispensed or administered by guards;

C. Guards must report all suspected cases of *delirium tremens* to medical staff immediately.