754 F.2d 120
 INMATES OF the ALLEGHENY COUNTY JAIL, Thomas Price Bey,
Arthur Goslee, Harry Smith, Robert Maloney, and
Calvin Milligan on their own behalf and
on behalf of all others
similarly situated
v.
Cyril H. WECHT, President of the Allegheny County Board of
Prison Inspectors and the other members of the Board;
Thomas Foerster and William Hunt, Commissioners for
Allegheny County, Frank J. Lucchino, Controller for
Allegheny County, Eugene Coon, Sheriff for Allegheny County,
the Honorable Patrick R. Tamilia, Michael J. O'Malley and
Marion K. Finkelhor, Judges Court of Common Pleas of
Allegheny County; Richard S. Caliguri, Mayor of the City of
Pittsburgh, Harriet McCray, Monsg. Charles Owen Rice and
Charles Kozakiewicz, Warden of the Allegheny County Jail,
and William B. Robinson, Executive Director of Prison
Inspectors and Cyril Wecht, Thomas Foerster and William H.
Hunt, as Commissioners of Allegheny County, Appellants.
 Nos. 84-3024, 84-3191.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 18, 1984.
Decided Jan. 29, 1985.
 
 Edward Feinstein (argued), Timothy P. O'Brien, Neighborhood Legal Services Ass'n, Pittsburgh, Pa., for appellees.
 James H. McLean, County Sol., Dennis R. Biondo (argued), Allegheny County Law Dept. Pittsburgh, Pa., for appellants.
 Before GIBBONS and BECKER, Circuit Judges, and VAN DUSEN, Senior Circuit Judge.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 County Officials of Allegheny County appeal from two orders entered by the United States District Court in the longstanding dispute over conditions at the Allegheny County Jail. In No. 84-3191 they appeal from an order dated March 13, 1984, denying their motion for modification of a May 25, 1983 order placing maximum population limits for male and female inmates in the jail. In No. 84-3024 the county officials appeal from an order dated December 30, 1983, directing them to pay a sanction of $5,000 for each prisoner released from the jail in order to comply with the inmate population limits. We affirm in No. 84-3191, and vacate and remand in No. 84-3024.
 
 I.
 Prior Proceedings
 A. The 1978 and 1980 Proceedings
 
 2
 On January 4, 1978 the district court, after a six-week trial in a class action brought pursuant to 42 U.S.C. Sec. 1983 (1982), held that the conditions in which inmates of the jail were held violated the United States Constitution in numerous respects. Owens-El v. Robinson, 442 F.Supp. 1368 (W.D.Pa.1978). In order to remedy those violations the court appointed a master to make a report and recommendations. The court adopted the master's recommendations in a final injunction dated October 11, 1978. Owens-El v. Robinson, 457 F.Supp. 984 (W.D.Pa.1978). The defendants did not appeal. The class representatives, however, appealed with respect to three requested remedies not included in the judgment. This court in Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir.1979) affirmed the district court on two of the issues, but remanded for further consideration of changes in the decree necessary to raise the level of pyschiatric care at the jail to the minimum required by the Constitution. After a five-day non-jury trial the district court in Inmates of Allegheny County Jail v. Pierce, 487 F.Supp. 638 (W.D.Pa.1980) found that the conditions in the jail with respect to care of mentally ill inmates amounted to deliberate indifference within the meaning of Estelle v. Gamble, 429 U.S. 97, 105-06, 97 S.Ct. 285, 291-92, 50 L.Ed.2d 251 (1976). The court also found that the provisions of the October 11, 1978 final injunction had not been fully complied with, and on April 17, 1980 entered an order directing that the October 11, 1978 order be fully implemented, and that specific steps be taken to remedy deliberate indifference to the care of mentally ill inmates. Inmates, 487 F.Supp. at 643-45. No appeal was taken from the April 17, 1980 judgment.
 
 B.
 The April 1983 Proceedings
 
 3
 At the time of the October 11, 1978 judgment the inmate population of the jail had not been found to be a factor contributing to the constitutional violations identified by the court. Indeed in 1975 the average daily inmate population was only 429, and the court found that "[o]vercrowding of the institution is not a problem." Owens-El, 442 F.Supp. at 1376. By April of 1983, however, conditions in the jail had been radically altered by an increase in the average daily inmate population to 690. The class representatives brought the deteriorating conditions to the district court's attention by moving to hold the defendants in contempt for failing to comply with the October 11, 1978 and April 17, 1980 orders, and for additional relief. The court held a six-day hearing on these motions, and found ongoing violations of both the October 11, 1978 and April 17, 1980 orders. Despite the seriousness of many of the violations, the court held that the conduct of the defendants did not rise to the level of contempt. The defendants moved to dismiss the motion for additional relief. The trial court denied this motion, holding that the class representatives had made an adequate showing of the need for such relief. The court credited the testimony of defendant William B. Robinson, a prior warden and currently Executive Director of the Allegheny County Prison Board, that the maximum number of inmates should be 475-500 males in the main unit, 63 males in the receiving unit, and 38 in the female section. On May 5, 1983 when the court toured the jail, the inmate population was 705. Robinson forecasted that if present arrest and sentencing trends continued the average daily population would eventually rise to 940. Summarizing its detailed findings of fact, the trial court observed:
 
 
 4
 The jail is now dangerously overcroweded. Fires and prisoner unrest are an ever-present danger in any penal setting. Here they could result in disaster. The Allegheny County Jail is a catastrophe waiting to happen. 565 F.Supp. 1278, 1281.
 
 
 5
 App. 57a (emphasis in original). Not finding the overcrowding to be for the express purpose of inflicting punishment, the court nevertheless held it to be a constitutional violation because the sole justification advanced for the crowded conditions was Allegheny County's disinclination, for economic reasons, to spend the funds necessary to provide additional facilities. "As a result," the trial court continued, "the jail remains with us--old, dilapidated and unconstitutionally overcrowded." App. 98a. Moreover, the court observed, "this condition impedes the implementation of the 1978 and 1980 orders. Therefore, an order to reduce the overcrowding not only is within our power to correct the constitutional violations, but also falls within our remedial powers to modify and enforce our previous orders." App. 99a. Accordingly on May 25, 1983 the court ordered:
 
 
 6
 [T]he population of the Allegheny County Jail [shall] be reduced as follows:
 
 
 7
 a. After July 1, 1983, there shall be no more than 650 male and 60 female inmates housed in the Jail.
 
 
 8
 b. After August 15, 1983, there shall be no more than 600 male and 50 female inmates housed in the Jail.
 
 
 9
 c. After October 1, 1983, there shall be no more than 550 male and 40 female inmates housed in the Jail.
 
 
 10
 d. After January 1, 1984, there shall be no more than 500 male and 30 female inmates housed in the Jail.
 
 
 11
 App. 104a. No appeal was taken from the May 25, 1983 order.
 
 C.
 The October 1983 Proceedings
 
 12
 Initially the defendants complied with the population caps. On August 4, 1983, however, they moved for relief from the May 25, 1983 order because of the anticipated difficulty in finding alternative arrangements for incarceration. This motion was denied, and no appeal was taken. On September 30, 1983 the defendants moved, again, for relief from the May 25, 1983 order. App. 107a. Their moving papers conceded that on September 30, 1983 the jail population exceeded the October 1, 1983 caps (550 males and 40 females) by 42 males and 7 females. As before, defendants relied upon the difficulty in finding alternative arrangements for incarceration.
 
 
 13
 The class representatives opposed modification of the May 25, 1983 order, pointing to the absence of any concrete proposal by the defendants for alternate arrangements, and to the willingness of several private charitable agencies to assist the county in housing low-risk inmates. The class representatives also moved that the court "[o]rder Defendants, under penalty of fine or other penalty as deemed appropriate by this Court, to immediately reduce the population of the Jail by whatever means necessary ... and to order any other relief necessary to ensure compliance with the Court's order." App. 115a.
 
 
 14
 A hearing on these motions, at which the defendants offered testimony, was held on October 10, 1983. In its opinion disposing of them the trial court found that since August 15, 1983 the population has been almost constantly in excess of the limits set for October 1, 1983. It found, further, that "[a]lthough there has been some reduction in population, the dangerously overcrowded condition of the jail is just as serious today as it was on May 25, 1983." App. 187a. To meet that emergency, the court held that Director William B. Robinson and Warden Charles Kozakiewicz would be ordered to release on their own recognizance those prisoners held in default of the lowest amount of bail, until the population limits of the May 25, 1983 order were met. App. 186a. On October 20, 1983 such an order was entered.[1] 573 F.Supp. 454.
 
 
 15
 No appeal was taken from the October 20, 1983 order.
 
 D.
 The December 30, 1983 Proceedings
 
 16
 When the October 20, 1983 order went into effect on November 1, 1983 Director Robinson and Warden Kozakiewicz began complying with its terms. By late December, 1983, 14 males and 12 females had been released. The order provided that it would be reviewed on or before March 1, 1984. App. 190a. On December 28, 1983 the trial court directed the parties to attend a status conference on December 30, 1983 "to report to the court on what steps the defendants are now taking to obtain interim facilities for housing prisoners pending completion of construction of the new Allegheny County Jail addition." App. 210-11a. At that status conference Director Robinson testified as to the inability of the county to consummate the purchase of a facility to house inmates who could not, under the May 25, 1983 and October 20, 1983 orders, be housed at the jail. He also testified about the unwillingness of the state prison authorities to accept sentenced state prisoners confined in the jail. Finally, he disclosed to the court the number of prisoners released to enable compliance with the October 20, 1983 order. At the conclusion of his testimony the trial court observed:
 
 
 17
 Well, I am still concerned about the lack of a facility--of an interim facility. I think the officials at the jail, the Warden and the Director, have done a remarkable job in moving these people around, but I still think that it is a poor substitute for having an interim facility here in the county, and I did prepare an order in anticipation of this hearing this morning, and I see no reason to change it....
 
 
 18
 App. 227a. The Court thereupon ordered "that after February 15, 1984, a sanction of $5,000 will be imposed against the defendants for each prisoner released under the formula described in this Court's order of October 20, 1983."[2] From this December 30, 1983 order the appeal in No. 84-3024 is taken. This court stayed execution of the $5,000 per person sanction pending appeal.
 
 E.
 The March 1983 Proceedings
 
 19
 On February 28, 1984 the defendants moved for a modification of the May 25, 1983 order so as to raise the permitted inmate population of the jail by 80 males. That motion was predicated upon certain repairs made to existing cells, and the proposed installation of two modular trailer housing units in the jail courtyard. The motion does not identify what rule the defendants relied upon, but it is not disputed that they were proceeding under Fed.R.Civ.P. 60(b). A hearing was held on the motion on March 8, 1984 at which time the defendants offered testimony by an architect, a corrections officer, Director Robinson and Warden Kozakiewicz. At the hearing it became apparent that efforts by the county officials to find temporary accommodations elsewhere for inmates had proved to be fruitless, although representations had been made to the court that such accommodations would be operational by March 1, 1984. At the close of the hearing the trial judge visited the jail to personally review the plans presented.
 
 
 20
 On March 13, 1984 the court denied defendants' motion for relief from the May 25, 1983 order. Addressing the suggested use of trailers the court found:
 
 
 21
 For lack of a better word, we will refer to the structure proposed by the defendants as a "trailer," for that is what most witnesses called it. It is not really a trailer, but rather a rectangular metal-covered structure that is 12' 11"' high, 28' wide and 76' long set on concrete block piers. It resembles two modular trailers put back-to-back. It is proposed that the trailer house forty inmates in twenty double-decker beds. It has its own toilet and shower facilities (28' X 10') and self-contained climate control but no recreational or living area other than the space between the double deckers. It would have two guards, one in a locked, glass-walled (polycarbonate) security area and another moving throughout the trailer.
 
 
 22
 The defendants want to place the trailer in an unused recreation yard within the jail. Several considerations militate against permitting the defendants to do this.
 
 
 23
 ....
 
 
 24
 What the defendants seem to have overlooked here is that the jail must provide more than a bed for each prisoner. The trailer will allow just under 45 square feet of space per inmate. The defendants' petition (Paragraph 3) had alleged that the trailer would contain "recreation-areas," but it did not.
 
 
 25
 ....
 
 
 26
 In the case sub judice, the proposed trailer would provide only 45 square feet per inmate, far below the minimum standards of any known health or corrections organization or federal court. This lack of space, and the problems associated therewith, would violate the inmates' constitutional rights under the Fourteenth Amendment.
 
 
 27
 The failure to provide adequate living space for the forty additional inmates is just one of the problems which would be created by the trailer. Director Robinson said that forty additional prisoners would mean additional visitors coming to the already cramped jail visitors' area, more attorneys in the inadequate lawyers' visiting room and an overall greater strain on food-service, the mental health unit and the already-limited gymnasium.
 
 
 28
 Besides inadequate space, perhaps the worst feature of the trailer proposal is its location. The yard where the defendants want to locate the trailer is immediately outside the jail hospital. The hospital area for patients is a circular room approximately thirty feet in diameter with beds for the patients sticking out from the walls toward the center of the circle.
 
 
 29
 At the edge of this circle, but in the same room with the hospital patients, is the door leading out to the area where the trailer would be located. One prisoner-patient's bed is approximately five feet from the door. The day we visited the jail (March 8, 1984) was very cold. When the door was opened for us to go out into the yard, a blast of icy air came right into the hospital room. It was not difficult to imagine what it would be like on a cold winter's day to have forty prisoners and assorted guards trooping in and out through that door past hospital patients suffering various ailments.
 
 
 30
 If an air lock were placed on the door (a suggestion made by the defendants after we commented on this problem), the cold blasts of air into the hospital might end. However, the constant traffic in and out of the hospital would make it extremely difficult to keep the hospital clean and sanitary, causing a health hazard to the patients. In addition, the forty prisoners and guards travelling to and from the trailer could become infected by the hospital inmates, thus creating a sort of reverse health hazard. Ill prisoners are purposely placed in the hospital ward for two reasons; 1) so that they may receive proper medical treatment, and 2) so that they are kept separate from the general population so as not to spread disease. The latter purpose would be frustrated if forty prisoners who spend their days in general population are in constant contact with the ill inmates.
 
 
 31
 The location of the trailer poses another very serious problem: the safety of the forty inmates and guards within the trailer in the event of a fire. As previously stated, the trailer will be within the confines of an old recreational yard, an area surrounded by stone walls towering 36 feet into the air. Since this area was once used by inmates for outside recreation, it had to be secure. Therefore, there are no accesses to the street and only one door into the jail itself. If a fire were to start in the trailer or near the door to the jail, those inmates and guards in the trailer would be trapped with no route of escape. If this were to occur, the possibility of serious injuries or death would be enormous.
 
 
 32
 Addressing the suggested use of cells which had been rehabilitated the court found:
 
 
 33
 The petition filed by the defendants also requested that we raise the male population cap by another forty inmates because "Since January 1, 1984, weekly cell reports have indicated that of the 587 existing cells, an average of 548 cells are available for male occupancy in the jail." (Petition, p 7).
 
 
 34
 The testimony of defendants' witnesses, however, including that of Lt. Matthew W. Kerr, a guard shift commander, revealed that of the 48 additional cells alleged to be available, only 10 could, in reality, be utilized. Some were in the reception area which must be available when an unusually large number of prisoners are brought in at the same time. Others currently (but not usually) were available in the Mental Health Unit and administrative areas. Both Warden Kozakiewicz and Director Robinson estimated that at most ten additional cells could be utilized within the ACJ [Allegheny County Jail].
 
 
 35
 The additional strain on the inadequate jail facilities caused by the presence of more inmates has already been discussed here in conjunction with the trailer proposal. Needless to say, the same factors apply in connection with using additional cells within the ACJ.
 
 
 36
 Concluding that the defendants had not convinced him that the May 25, 1983 order should be modified, the court observed:
 
 
 37
 While one can always argue that the 500 male population cap is an arbitrary figure, it must necessarily be so. Perhaps another judge, viewing the same factual situation, would say that the constitutional limit could be 510, and such a finding would not necessarily be an abuse of discretion either. Nevertheless, the limitation must be set at some point, and attempts to change the figures, once established, must likewise end. We believe that in its present condition the Allegheny County Jail should have a population of no more than 500 males and 30 females and that any number in excess of those limits would violate the constitutional rights of the inmates.
 
 
 38
 From the March 13, 1984 order denying their Rule 60(b) motion the defendants appeal at No. 84-3191.
 
 II.
 Our Rulings
 A. The March 13, 1984 Order
 
 39
 We have appellate jurisdiction to review the denial of a Rule 60(b) motion to modify an injunction. 28 U.S.C. Sec. 1292(a)(1) (1982). Although the defendants do not specify which ground for Rule 60(b) relief they rely upon, we conclude that they are proceeding under Rule 60(b)(5), which provides for relief from a judgment when "it is no longer equitable that the judgment should have prospective application."
 
 
 40
 The Rule confers on district judges "[no] standardless residual discretionary power to set aside judgments...." Mayberry v. Maroney, 558 F.2d 1159, 1163 (3d Cir.1977). Such relief is extraordinary and may be granted only upon a showing of exceptional circumstances. Id.
 
 
 41
 Philadelphia Welfare Rights Org. v. Shapp, 602 F.2d 1114, 1119 (3d Cir.1979). Since the extraordinary circumstances standard applicable to the trial court's exercise of discretion is a strict one, our review of the denial of Rule 60(b)(5) relief is commensurately narrow. Where, as here, an evidentiary hearing has been held, the trial court's findings of fact must be accepted unless clearly erroneous. Fed.R.Civ.P. 52(a). The court's exercise of discretion in light of supportable findings of fact will not be disturbed unless there was a clear abuse. Hodge v. Hodge, 621 F.2d 590, 593 (3d Cir.1980); S.E.C. v. Warren, 583 F.2d 115, 120 (3d Cir.1978); Girard Trust Bank v. Martin, 557 F.2d 386, 390 (3d Cir.1977); Virgin Islands National Bank v. Tyson, 506 F.2d 802, 804 (3d Cir.1974); Giordano v. McCartney, 385 F.2d 154, 155 (3d Cir.1967).
 
 
 42
 Applying these standards of review, we affirm the March 13, 1984 order. The trial court's findings of fact, far from being clearly erroneous, are fully supported by record evidence that is for the most part undisputed.[3] The defendants made no real showing of extraordinary circumstances occurring since the entry of the May 25, 1983 injunction, from which no appeal was taken. The makeshift arrangements which they proposed in March of 1984 could have been suggested a year earlier, but were not. Instead, the defendants allowed the inmate ceilings to go into effect, while making no arrangements for alternative places of accommodation outside the jail. The County's reluctance to find such alternative accommodations is the same as it was in the spring of 1983. Meanwhile, by virtue of the ceiling on the jail population, some alleviation of the unconstitutional conditions found by the trial court occurred as a result of the May 25, 1983 injunction. As the court's findings make clear, what the defendants proposed in their Rule 60(b)(5) motion was to reinstate conditions which had already been found to be constitutional violations, and to add new risks to the health and safety of inmates. We can find no clear abuse of discretion in the court's denial of the defendants' motion for such extraordinary relief.
 
 B. The December 30, 1983 Order
 
 43
 The parties are not in agreement as to the nature of the December 30, 1983 order imposing a sanction of $5,000 on the defendants for each prisoner released from custody under the terms of the October 20, 1983 order. It is undisputed that the trial court intended the sanction to act as a spur to action by the county with respect to the provision of facilities for housing inmates outside the jail.[4] Since the $5,000 is described as a sanction it may have been intended as a civil contempt order. Alternatively, as urged by the class representatives, it may have been intended as a modification of the underlying injunction.
 
 
 44
 In either event we have appellate jurisdiction. If it was intended as a civil contempt, it was entered in a post-permanent injunction proceeding, and is reviewable under 28 U.S.C. Sec. 1291, but only with respect to the question whether the alleged contemnor has disobeyed the underlying injunction. Halderman v. Pennhurst State School & Hospital, 673 F.2d 628, 636-37 (3d Cir.1982). If it was intended as a modification of the underlying injunction, the December 30, 1983 order is reviewable under 28 U.S.C. Sec. 1292(a)(1). Because the trial court's intention is not entirely clear, we will consider alternative constructions of the order.
 
 
 45
 (1) Civil Contempt
 
 
 46
 We noted in Part II B above, that in April of 1983 the class representatives moved to hold the defendants in contempt of the October 11, 1978 and April 17, 1980 orders. At the close of the plaintiffs' case the court found that the defendants' conduct did not rise to the level of contempt. App.60a. The class representatives' motion for additional relief was granted, however, resulting in the May 25, 1983 order imposing a cap on inmate population, and other relief.
 
 
 47
 The other relief in the May 25, 1983 order might well have included a direction to the county defendants to produce and implement a plan within a specified time for housing inmates elsewhere.[5] The court did not do so. Instead the order provided for a gradual reduction of the inmate population over five months, in the obvious hope that the inability to house greater numbers of inmates in the jail would move the county to discharge an obligation resting, under state law, with county government. The sad record of Allegheny County in this respect demonstrates that this hope was misplaced. While the court's frustration over the County's attitude is understandable, even irresponsible officials can only be held in civil contempt as a means of coercing their compliance with specific court orders.
 
 
 48
 The court has found numerous violations of the successive injunctions entered in this case since October 11, 1978. Indeed, the court has found violations of its May 25, 1983 order imposing population limits. The December 30, 1983 order is not, however, directed toward coercing a correction of such violations. By December 30, 1983 the jail officials were in compliance, and they have given no indication that the population limits will in the future be exceeded.
 
 
 49
 Plainly, therefore, if the $5,000 per released prisoner is to be regarded as a contempt sanction, it is one aimed at coercing the County into spending the funds needed to develop and implement a plan for an alternative housing arrangement. There is no question but that the defendants are fully aware of the court's wishes in this respect. Wishes, however, are not orders. Fed.R.Civ.P. 65(d) requires that "[e]very order granting an injunction ... shall be specific in terms; [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained...." This requirement of specificity is related to the court's awesome civil and criminal contempt powers. Persons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct. Granny Goose Foods, Inc. v. Local 70, International Brotherhood of Teamsters, 415 U.S. 423, 444, 94 S.Ct. 1113, 1126, 39 L.Ed.2d 435 (1974); Schmidt v. Lessard, 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974); Gunn v. University Committee To End The War in Viet Nam, 399 U.S. 383, 388-89, 90 S.Ct. 2013, 2016-17, 26 L.Ed.2d 684 (1970). Under the terms of the May 25, 1983 order, the County defendants were free to do what they are doing: release prisoners in order to comply with the population limits in the jail. They were not given any specific direction to prepare and implement an alternative plan for housing inmates. Thus they cannot be held in civil contempt for failing to do so, however irresponsible that failure may be.
 
 
 50
 (2) Modification of the Injunction
 
 
 51
 The court's October 20, 1983 order provided that it would be reviewed on or before March 1, 1984. Thus the defendants were on notice that the trial court might modify it to provide for additional relief. They were also on notice that in the motion which resulted in the October 20, 1983 order the class representatives requested that the court
 
 
 52
 [o]rder Defendants, under penalty of fine or other penalty as deemed appropriate by this Court, to immediately reduce the population of the Jail by whatever means necessary, to levels consistent with restrictions set forth in this Court's May 15th [sic] Order, and to order any other relief necessary to ensure compliance with the Court's Order.
 
 
 53
 App. 115a. Arguably the notice of motion and the court's retention of authority to review its order on or before March 1, 1984 gave the defendants notice that further relief would be considered on December 30, 1983. Moreover the defendants were given a full opportunity to present testimony with respect to additional relief. Assuming, without deciding, that notice and an opportunity to be heard on December 30, 1983 satisfied procedural due process, we turn to the question whether the order which was entered, if considered as a modification of the injunction, was an abuse of discretion.
 
 
 54
 At the outset we note that the $5,000 sanction imposed for each prisoner released is to be paid to the Clerk of Court of the United States District Court. No provision is made for the disposition of these funds; apparently they would inure to the benefit of the United States. The court did not direct the defendants to implement an alternative plan for housing inmates, and couple that order with fines for delay which could be used by the court or the plaintiffs to develop their own plan. There is no discernable connection between the sanction and any of the remedial features of the injunction in place. If the court had directed the County defendants to develop and implement a plan for alternative housing, there would be an obvious relationship between such an order and a monetary sanction for delay in compliance. Absent such a relationship, however, we are reluctantly constrained to hold that the December 30, 1983 order, insofar as it directed the defendants to pay $5,000 to the Clerk of the United States District Court for each released inmate, lacked a sufficiently specific nexus with the underlying violations and their correction so as to amount to an abuse of discretion. Our reluctance reflects our complete sympathy with the court's frustration with County Officials whose continued contumacy has aggravated a serious problem which itself was in large part a result of their inactivity.
 
 III.
 Conclusion
 
 55
 In No. 84-3191 the order denying a Motion for Rule 60(b) relief from the provisions of the May 25, 1983 injunction will be affirmed. In No. 84-3024 the order of December 30, 1983 will be vacated and the case remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 The order provided that the Court of Common Pleas was free to specify a different method of bringing the population of the jail into compliance with the May 25, 1983 order. Such a plan was proposed, with a stipulation that if it proved to be unsuccessful the provisions of the October 20, 1983 order would govern
 
 
 [2]
 The full text of the order is as follows:
 AND NOW, to-wit, this 30th day of December, 1983, after a hearing in open court, it appearing that:
 
 
 [1]
 the October 20, 1983 Order of this Court set a maximum limit of 500 men and 30 women in the Allegheny County Jail as of January 1, 1984; and
 
 
 [2]
 the experience at the Allegheny County Jail in recent years has been that the population generally exceeded those limits; and
 
 
 [3]
 the October 20, 1983 Order of this Court provided that when the various population limits previously ordered were exceeded, and if the Court of Common Pleas did not adopt an alternate plan, jail officials were authorized and directed to release on their own recognizance prisoners held in default of the lowest amount of percentage bail until the population level was met; and
 
 
 [4]
 jail officials have found it necessary to release some prisoners pursuant to that formula because Allegheny County has not provided an interim facility to house such prisoners pending completion of the Allegheny County Jail addition at the site of the Jones Law Building; and
 
 
 [5]
 it having been the intention of this Court to order such release only as "a temporary effort to ameliorate the situation, not as a solution to the problem" (See Memorandum Opinion of October 20, 1983, page 7); and
 
 
 [6]
 it being apparent that such releases are a poor substitute for the provision of suitable interim housing facilities; and
 
 
 [7]
 it being apparent to this Court that it is within the capability of county officials to provide the necessary interim facility;
 It is HEREBY ORDERED, ADJUDGED and DECREED that after February 15, 1984 a sanction of $5,000 will be imposed against the defendants for each prisoner released under the formula described in this Court's Order of October 20, 1983. Such funds shall be paid to the Clerk of Court of the United States District Court for the Western District of Pennsylvania. Robert J. Cindrich, Esq., the court-appointed monitor, shall be responsible for monitoring the releases made pursuant to the formula aforesaid.
 App. 231a-32a.
 
 
 [3]
 The trial court did discredit several affidavits, filed after the hearing, dealing with health and food services, as inconsistent with testimony at the hearing. The affiants had not been subject to cross-examination
 
 
 [4]
 Press reports as recent as December 18, 1984 suggest that the County, despite the spur, still balks. Pittsburgh Post-Gazette, Dec. 18, 1984, at 6, col. 1
 
 
 [5]
 Orders to responsible public officials to prepare and submit plans for remedying constitutional violations are not uncommon. Such orders often issue in the school desegregation context. See, e.g., Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Monroe v. Bd. of Comm'rs, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1968); Evans v. Buchanan, 555 F.2d 373 (3d Cir.), cert. denied, 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977); Hoots v. Pennsylvania, 703 F.2d 722 (3d Cir.1983); Arthur v. Nyquist, 547 F.2d 7 (2d Cir.1976), cert. denied, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978); Brewer v. School Bd. of Norfolk, 434 F.2d 408 (4th Cir.), cert. denied, 399 U.S. 929, 90 S.Ct. 2247, 26 L.Ed.2d 796 (1970); Cisneros v. Corpus Christi Indep. School Dist., 467 F.2d 142 (5th Cir.1972), cert. denied, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044 (1973); United States v. School Dist. 151 of Cook County, 404 F.2d 1125 (1968), cert. denied, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971); United States v. School Dist. of Omaha, 521 F.2d 530 (8th Cir.), cert. denied, 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975); Kelly v. Guinn, 456 F.2d 100 (9th Cir.1972), cert. denied, 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1973)
 Similarly in the prison context the courts have authority to order local officials to take costly measures necessary to cure constitutional violations. Union County Jail Inmates v. DiBuono, 713 F.2d 984 (3d Cir.1983). Such orders are often quite comprehensive. See, e.g., Hamilton v. Landrieu, 351 F.Supp. 549 (E.D.La.1972) (court order requiring inter alia: immediate construction of hospital-infirmary, future construction of indoor recreation area, wage increases for some personnel, additional staffing, renovation of each tier, and provision of funds for an "ombudsman"); Taylor v. Sterrett, 344 F.Supp. 411, 422 (N.D.Tex.1972), aff'd in part, rev'd in part, 499 F.2d 367 (5th Cir.1974) (court order requiring renovation of cells of several hundred inmates and provision of facilities for recreation, religious and educational programs); Jones v. Wittenberg, 330 F.Supp. 707, 720-21 (N.D.Ohio 1971), aff'd sub nom. Jones v. Metzger, 456 F.2d 854 (6th Cir.1972) (court order requiring extensive repairs and remodelling). Cf. Detainees of Brooklyn House of Detention v. Malcolm, 520 F.2d 392 (2d Cir.1975).