INMATES OF the ALLEGHENY COUNTY JAIL, Thomas Price Bey, Arthur Goslee, Robert Maloney, and Calvin Milligan on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Cyril H. WECHT, President of the Allegheny County Board of Prison Inspectors and the other members of the Board: Thomas Foerster and William H. Hunt, Commissioners for Allegheny County; Frank J. Lucchino, Controller for Allegheny County, Eugene Coon, Sheriff for Allegheny County; the Honorable Patrick R. Tamilia, Michael J. O'Malley and Marion K. Finkelhor, Judges, Court of Common Pleas of Allegheny County; Richard S. Caliguiri, Mayor of the City of Pittsburgh; Harriet McCray; Monsg. Charles Owen Rice and Charles Kozakiewicz, Warden of the Allegheny County Jail, and William B. Robinson, Executive Director of Prison Inspectors, and Cyril Wecht, Thomas Foerster and William H. Hunt, as Commissioners of Allegheny County, Defendants.

Civ. A. No. 76–743.

United States District Court, W.D. Pennsylvania.

June 26, 1985.

James J. Dodaro, County Sol., Dennis Biondo, Asst. County Sol., Pittsburgh, Pa., for defendants.

Edward Feinstein, Neighborhood Legal Services, Pittsburgh, Pa., for plaintiffs.

COHILL, District Judge.

Presently before the Court is a Motion by Plaintiffs for Additional Relief, arising out of the alleged current practice of the Warden of the Allegheny County Jail of refusing admission to women committed to the Allegheny County Jail at times when the women's population of the jail reaches the population cap of 30 women imposed by previous orders of this Court.[1]

Plaintiffs allege that because of Defendants' policy, female prisoners legally committed by district magistrates to the Allegheny County Jail are kept in police lock-ups of the City of Pittsburgh, often for extended and unreasonable periods of time in view of the conditions in the lock-ups. Motion for Additional Relief, at 2. Plaintiffs allege that, in allowing this situation to exist, Defendants are violating previous orders of this Court and the constitutional rights of the detainees. *Id.* Plaintiffs further allege that the lock-ups were designed to house detainees for the short time required for police processing and a magistrate's hearing, rarely more than 4–6 hours. Plaintiffs claim that the Defendants are, in fact, using the lock-up as an auxiliary jail. The conditions alleged to contribute to the conclusion of unconstitutionality are 1) crowding of cells: four of the seven female cells in the Public Safety Building ("PSB") lock-up have three beds, a commode and a sink crowded into each, resulting in the inmates having virtually no space to move; 2) female inmates must eat their meals in these cells; 3) at times, bunk beds have been added to the aforesaid cells to house additional inmates; 4) inadequate space for exercise or other recreation; 5) a staff consisting solely of police matrons and police officers who do not have sufficient training to screen prisoners for potential suicides, mental, or other health problems; 6) absence of treatment facilities or personnel; 7) nonexistence of funds to purchase medication for inmates and absence of professionals to prescribe medication; 8) health intervention available only for acute physical emergencies and where behavior is so dangerous that an emergency commitment is called for; 9) no clothing provided for inmates; 10) no access to a law library; and 11) absence of facilities for visits. *Id.* at 2–3.

---

1. Previous opinions in this case are published at 442 F.Supp. 1368; 457 F.Supp. 984; 487 F.Supp. 638; 565 F.Supp. 1278; 573 F.Supp. 454.

Plaintiffs argue that since the lock-ups are, *de facto*, being used by the Defendants as an auxiliary jail, Defendants are as responsible for the constitutionality of conditions which its prisoners endure, as they would be for conditions in the Allegheny County Jail or any other facility to which Defendants transferred excess numbers of inmates. *Id.* at 3. Plaintiffs argue that by refusing admission to detainees who are lawfully committed to the Allegheny County Jail, and instead, by retaining them in police lock-ups under unconstitutional conditions, the Defendants have violated the terms of orders of January 4, 1978 (imposing conditions); the October 11, 1978 (same); the April 17, 1980 (same); and May 25, 1983 (imposing conditions and setting population limits).

Plaintiffs invoke the broad power of this Court to remedy violations of its orders in requesting us to 1) enjoin Defendants from delaying admission into the Allegheny County Jail of any female detainee who has been committed to the jail in default of bond, and who would otherwise be held in a police lock-up in the City of Pittsburgh; 2) enjoin Defendants from delegating their responsibility to house inmates to City police officials or to any other person unless they first certify to the Court that they have inspected the facility and have found that the conditions of confinement are in compliance with the requirements for the Allegheny County Jail as set forth in this Court's prior rulings; and 3) other relief appropriate and necessary to ensure the effectiveness of this Court's remedy. *Id.* at 4.

Defendants respond that 1) they have no knowledge or information as to conditions of confinement at the police lock-ups; 2) Defendants have taken no action to retain inmates in the police lock-ups nor do they send inmates to those lock-ups; 3) Defendants are not responsible for the constitutionality of conditions in the lock-ups; 4) females committed to the Jail in default of bond are not members of the class certified in this case unless they are actually physically incarcerated in the Jail, and that movants thus lack standing to seek relief in this case; 5) Defendants have no mandatory, statutory, or regulatory duty requiring them to accept prisoners into the Jail; 6) Plaintiffs are impermissibly attempting to extend the scope of this action beyond the conditions in the Allegheny County Jail; and 7) the Court lacks jurisdiction over this claim insofar as the movants attempt to litigate the issue of conditions in the city lock-up. Response to Motion for Additional Relief, at 1–4.

Three issues must be decided in order to resolve Plaintiff's motion for additional relief. The threshold issue is whether the female inmates being held at the city lock-up are members of the class certified in this lawsuit. Second, assuming that female inmates at the city lock-ups are members of the class, we must determine whether the conditions in the lock-ups are unconstitutional. Third, if the conditions are unconstitutional, we must determine whether the holding of female inmates in such conditions violates this Court's prior orders. Finally, we must determine the appropriate relief.

We find it useful to begin with a short summary of relevant previous orders in this case, and a statement of the facts found at the evidentiary hearing held on June 3, 1985 on Plaintiff's motion for additional relief.

BACKGROUND

On May 25, 1983, in an opinion and accompanying order, we directed that the inmate population of the Allegheny County Jail be reduced in a series of steps. *See Inmates of the Allegheny County Jail v. Wecht*, 565 F.Supp. 1278 (W.D.Pa.1983). By October 20, 1983, the population of the jail was almost constantly in excess of the limits set by this Court. Faced with the population limit thus becoming a nullity, we ordered that unless the Court of Common Pleas of Allegheny County adopted a different method of compliance that, in order to meet the population limit, the Warden release, on their own recognizance, males and females being held in default of the lowest amount of bond, until the popu-

lation limits were met. We noted that precedent existed for such an order. *See* 573 F.Supp. 454, 457–58 (W.D.Pa.1983) (citing *Duran v. Elrod,* 713 F.2d 292 (7th Cir.1983); *Benjamin v. Malcolm,* 564 F.Supp. 668 (SDNY 1983)). We also stated that, since the release order was a drastic remedy, it should in no way be construed by the Defendants as a reason for them to relax their efforts to obtain additional housing. *Id.* We stated, "[t]his entire situation will again be reviewed by us on or before March 1, 1984 to ascertain how successful the County officials have been in arranging for interim facilities." *Id.* We also ordered that no federal prisoners be housed in the Allegheny County Jail except during the time any such prisoners were standing trial. *Id.*

With the passage of months, it became apparent the release order, intended to be a temporary measure designed to ensure compliance with the population cap, had become the operating rule for the Jail. On December 30, 1983, we observed that the release order had come about because Allegheny County "had not provided an interim facility to house such prisoners pending completion of the Allegheny County Jail addition, ... [that] such releases are a poor substitute for the provision of suitable interim housing facilities, ... [and that] it is within the capability of the county officials to provide the necessary interim facility." Order of December 30, 1983, at 1–2. We ordered that if releases continued after February 15, 1984, approximately four months after our emergency release order, a sanction of $5,000 would be imposed against Defendants for each prisoner released. *Id.* at 2.

This order was appealed. The Court of Appeals for the Third Circuit affirmed in part, and vacated and remanded in part. *See Inmates of the Allegheny County Jail v. Wecht,* 754 F.2d 120 (3d Cir.1985). In response to the decision of the Court of Appeals, we ordered a hearing to be held on February 20, 1985 and that Defendants, at that time 1) apprise the court of progress on the auxiliary jail under construction; and 2) apprise the court of

"plans for alternate facilities in order to prevent the further release of prisoners. *If no plan is presented, the Court will order further appropriate action at that time.*" Order of January 31, 1985, at 4. (emphasis added). A hearing was held February 27, 1985. The Court heard testimony from a number of witnesses for Defendants as to various efforts by the County to find alternate facilities. *See* Transcript of Hearing, February 27, 1985. In an opinion read from the bench, we concluded that the measures taken by the County continued to be, in essence, a stopgap approach to a serious and continuing problem. Based on the testimony we heard, we raised the population limit for males from 500 to 510, and further ordered that "By May 6, 1985, the Defendants are directed to obtain constitutionally adequate facilities for prisoners who would otherwise be released because of overcrowding at the jail." Opinion and Order of February 27, 1985, at 9. We stated that a hearing would be conducted on May 6 to determine what facilities had been obtained and the adequacy of such facilities. *Id.* at 10. Finally, we stated that "[a]fter May 6, 1985, a fine of $5,000 will be imposed on the County of Allegheny for each prisoner released because of lack of adequate facilities." *Id.*

On May 3, 1985, prior to the hearing, we paid a surprise visit to the Jail. We found the Jail to be in compliance with our previous orders.

On May 6, 1985 we conducted a hearing to determine what alternate facilities the County had obtained. Warden Kozakiewicz testified that the population limit of 510 men has not adversely affected conditions in the Jail, and that all jail spaces available in outlying counties have been secured on a contract basis for use by Allegheny County. Transcript of May 6 Hearing, at 3–7. The Warden testified that from March 1, 1985—March 29, 1985, there had been 9 releases to meet the population limit, but that from March 29 until May 6, the date of the hearing, no prisoners had been released from the Jail. *Id.* at 6–7. The Warden also testified as to the salutary effect of a

recent decision by the Pennsylvania Supreme Court addressing the obligation of the State to relieve the County of the burden of holding state prisoners. *See County of Allegheny v. Commonwealth,* — Pa. —, 490 A.2d 402 (1985). The Warden testified that as a result of the decision, the average population of the Jail had dropped to 475–480 Inmates Tr. at 6. The Warden also testified that if these figures held, there would be no need for an interim facility. *Id.* at 8. The Warden testified he had continued, however, to attempt to find an alternate facility, and that one alternate facility, 268 Center, Inc., a privately-operated prison, was scheduled to begin operations in mid-May in Armstrong County, Pennsylvania. The facility will have 55 rooms available for nondangerous inmates and "driving under the influence" ("DUI") offenders. Tr. at 3–26. The Warden was unable to answer many questions about staffing and services at the 268 Center. *Id.* The Warden stated, however, that no space in the 268 Center was available for the housing of women. *Id.* at 25.

On cross examination, the Warden stated that while the effect of the Pennsylvania Supreme Court decision had been to reduce the male population, it had had no effect on the female population. The female population generally remains at 30, the maximum limit set by this Court. *Id.* at 11. The Warden also testified that females from the city lock-ups were often not admitted to the jail after a commitment order by a magistrate. *Id.* at 11–12. The Warden testified that an interim facility might still play a role for females. *Id.* at 12.

In light of the information presented at the May 6, 1985 hearing, we entered an order which stated that while the County was presently in compliance with the population limits, and while efforts had been taken to attempt to obtain alternate facilities, that no facility had yet been obtained. Order of May 7, 1985. We ordered that 1) the present limit of 510 men and 30 women would remain in effect; 2) a fine of $5,000 would be imposed on the County for each prisoner released to meet the population limits, which fine was not to be collected

until appeals were final; 3) a hearing would be held at or about the time of the opening of the 268 Center to ascertain its adequacy as an alternate facility; and 4) the 268 Center was not to be used as an alternate facility without specific order of this Court. *Id.*

Subsequent to that order we received the present motion for additional relief addressed to the conditions with respect to female inmates at the Public Safety Building City lock-up.

THE JUNE 3, 1985 HEARING

Plaintiffs presented nine witnesses at the June 3, 1985 hearing.

Joseph James, Chief Magistrate of the City of Pittsburgh, testified as to the usual procedures employed by magistrates in committing persons brought before them. Tr. at —. Magistrate James stated that preliminary arraignments are usually held within six hours of arrest, at which time bond, if the defendant is entitled to bond, is set. In addition, a defendant is given notice of the charges filed against him and notice of the time and date of the preliminary hearing. Id. at —. A defendant, after bond is set, is held for one-to-two hours in the City lock-up. If he is unable to post bond, he is committed to the Allegheny County Jail. Magistrate James testified that all magistrates use the same commitment order, which instructs the "Warden of the Allegheny County Jail" to receive and hold the Defendant. *See* Order of Commitment, Plaintiffs' Memorandum in Support of Motion for Further Relief, Ex. A. Magistrate James testified that the Allegheny County Jail is the only jail in the County, and that he has never ordered a defendant committed to any other jail. Tr. at —. He stated that he has never ordered a Defendant committed to the Public Safety Building lock-up. Id. at —.

Mr. Louis DiNardo, Administrative Assistant to Superintendent Robert Coll of the Pittsburgh Police Department, testified that the Public Safety Building is maintained by the Pittsburgh Police Department and is in the process of being remod-

eled. Tr. at ——. Mr. DiNardo stated that no medical or psychological personnel are employed at the Public Safety Building lock-up. *Id.* at ——. No social workers are assigned to the City lock-ups, and the matrons employed are not specially trained. Mr. DiNardo stated that when a medical question or emergency arises, the staff contacts Pittsburgh Emergency Medical Services ("EMS"), who send technicians to the lock-up. *Id.* at ——. No psychiatric personnel are on call, nor is the lock-up equipped with any screening facilities to screen for mental health problems in arriving inmates. The lock-up has no resources to provide or prescribe medication, no clothing is provided to incoming inmates or detainees, and no personal laundry facilities are available. *Id.* at ——.

Mr. DiNardo testified that every day, the staff of the lock-up informs both the bail agencies and the County Jail as to the status of and length of time an inmate has been held. Prisoners are moved out of the lock-up to the County Jail as space becomes available. Mr. DiNardo stated that ten cells are also being used at # 7 Police Station on the South Side. If medical problems arise at either lock-up, an attempt is made to transfer the prisoner to the County Jail. *Id.* at ——.

Ms. Dolores Wallace, a detention officer at the Public Safety Building lock-up, testified that she has held her present position for eleven years. Her training was administered by the City of Pittsburgh. Ms. Wallace testified that she helps female prisoners get ready for their arraignments. Tr. at ——. Ms. Wallace stated that before the preliminary arraignment, inmates are considered "city prisoners," but that if the female prisoners are returned to the PSB lock-up, having failed to post bond, they are considered "county prisoners." Ms. Wallace testified that the PSB lock-up started receiving the "county prisoners" within the last year, and that the "county" prisoners are kept in four cells specially designated for the "county." *Id.* at ——. Ms. Wallace stated that city prisoners are kept in cells on one side of the hallway, while county prisoners are kept in four

cells on the opposite side of the hall. This arrangement is referred to as the "city side" and the "county side." *Id.* at ——.

Ms. Wallace testified that, of the four cells designated for "county" prisoners, two of the cells have three beds in each, and, the other two cells have two beds in each. Each cell also has a commode and a sink. *Id.* at ——. Ms. Wallace stated that there is very little room in the cells to move around, and that in the cells with three beds, there is enough room for an inmate to put her feet down between the beds. The walls are concrete. Ms. Wallace testified that there are no windows and little ventilation in the cell area. The female cell area contains one bathtub and one shower, which has only cold water. Ms. Wallace testified that much of the time the shower does not work. *Id.* at ——. No visitors are allowed in the lock-up. Attorneys are permitted to talk with inmates. Ms. Wallace testified that inmates have no access to any law library. The lock-up has no kitchen or facilities for food preparation. One hot meal is served at lunch; all meals come from a snack bar in the Public Safety Building. Inmates eat in their cells sitting on their beds. No separate dining facilities exist, and no extra chairs are available.

Ms. Wallace testified that each morning she calls a warrant officer assigned to the Public Safety Building, who, in turn, calls the County Jail to ascertain if it can receive any prisoners. Ms. Wallace prepares a list of the female inmates each day, which lists are the basis of records kept by the Pittsburgh Police Department. *See* Plaintiff's Ex. 1, 6/3/85. These daily reports indicate by asterisks inmates who have been incarcerated in the Public Safety Building three or more days. *Id.*

Ms. Wallace testified that each matron works alone, and is not usually relieved in the course of an 8-hour shift. This situation exists even when the lock-up holds as many as twenty-one female inmates.

Ms. Wallace testified that prisoners often arrive with dirty clothing; no clothing is supplied in the lock-up. Prisoners are al-

lowed to call friends or relatives to have clothes, shampoo and toothpaste delivered to them. Prisoners are supplied with soap, towels, and sheets. *Id.* at ——.

Ms. Wallace testified that the matron on duty searches all female prisoners as they arrive. Prisoners are not questioned, nor are the matrons trained to ask questions. Since no medical personnel are on duty, a matron must call the Emergency Medical Service if a medical problem arises. Ms. Wallace testified that she would not know if an arriving prisoner is suicidal. If problems arise with inmates, a matron notifies the sergeant on duty. *Id.* at ——. Ms. Wallace testified that no isolation cells exist for female inmates; prior to the present overcrowding, one or two cells were kept separate for "fighters."

Plaintiffs next presented Yvonne Pendergraft, another detention officer at the Public Safety Building lock-up. She testified that she has worked at her present job for 2½ years, and received four days of on-the-job training. Prior to her current job, she was a psychiatric attendant at St. Francis Hospital for five years. Tr. at ——. Ms. Pendergraft testified that she works the 11 P.M. to 7 A.M. shift at the PSB lock-up. She testified that the typical night shift is chaotic, with an average of 17–18 prisoners arriving during the night. Many are intoxicated, and the noise level is high. Ms. Pendergraft testified that the "county" prisoners are across the aisle from the "city" prisoners; the lock-up has no isolation cells and no screening for suicides.

Ms. Pendergraft testified that the lock-up has been taking "county" prisoners since approximately September or October 1984. She described county prisoners as those female prisoners who have commitment papers to the Warden of the Allegheny County Jail; when female prisoners receive these commitment papers, they are moved from the "city side" to the "county side."

Plaintiff's next witness, Donna Santucci, testified that she is a Program Supervisor at the Allegheny County Mental Health Renaissance Center. Tr. at ——. Ms. San-

tucci testified that she is a rehabilitative counselor for one Renee H. (last name intentionally omitted), a client who was arrested and taken to the City lock-up on Saturday, April 13, 1985. Ms. Santucci testified that Renee's sister-in-law telephoned her on Monday, April 15, 1985, and informed Ms. Santucci of Renee's arrest and location. Ms. Santucci testified that over the weekend Renee H. had not seen a lawyer or doctor, and had not been able to sleep because of the noise. *Id.* at ——. Ms. Santucci testified that Renee H. takes medication for a psychiatric condition, and that she, Ms. Santucci, had called a Public Defender to discuss the situation. Ms. Santucci stated that Public Defenders do not become involved in representing prisoners until they go to the County Jail. Ms. Santucci testified that, because she was worried about Renee's mental and physical health, she initiated a conference call among herself, the Program for Female Offenders, and the Behavior Clinic at the Allegheny County Jail, to inform them that Renee H. should be evaluated for her own safety and the safety of those around her. The matrons at the lock-up had informed Ms. Santucci that no psychiatric evaluation could be done. Ms. Santucci testified that she informed the matrons of the medication Renee H. needed; Ms. Santucci testified that Renee's family finally took the medication to the Public Safety Building. Id. at ——.

Renee H. then personally testified as to her experience in the Public Safety Building lock-up. Tr. at ——. She stated that she was arrested and taken to the Public Safety Building. She was arraigned, and, on the next day, was placed on the "county" side. Renee H. testified that she remained in the Public Safety Building for three days following her arraignment, that there were three women in her cell, and that the loud noise and constant commotion made rest impossible. *Id.* at ——. She stated that inmates eat sitting on their beds, and that there was no exercise. Renee H. also testified to the problems she underwent in trying to obtain necessary

medication which she did not have with her at the time of her arrest. The matrons at the Public Safety Building told her to have her family bring it to her. Renee H. testified that the matron did not know if she could administer the medication, and was forced to call the paramedics.

Carol Kowall, a staff attorney for Neighborhood Legal Services, testified that she went to the Public Safety Building lock-up in September, 1984. Tr. at ——. Ms. Kowall described attempting to find a client among the women prisoners, and observed a naked woman in one cell, "ranting and raving," and trying to sweep water off the floor of her cell with a piece of cardboard. She testified that she found her client alone in a cell, sitting on a metal bed with no mattress. *Id.* at ——. Ms. Kowall testified that her client, a "city" prisoner at the time, was incoherent and stripped to the waist. Her client had ripped the waistband from her skirt and had tied it under her breasts. She was in the process of ripping her blouse apart and tying it into strips. Ms. Kowall testified that she reported the situation to the sergeant on duty who stated that there was nothing he could do.

Two other female inmates, Renee D. and Sherlina W., also testified for the Plaintiffs. Renee D. testified that she had been arraigned six hours after being brought to the Public Safety Building, and remained there for seven days. Tr. at ——. Renee D. testified as to the noise and overcrowding; in addition, she testified that one female inmate who was in the lock-up at the same time, had syphilis. Renee D. testified that no screening of incoming inmates is performed, and that "crazy people" coexist with the other female inmates. *Id.* at ——. Renee D. further testified that one inmate had taken her own excrement and was wiping it on the toilet. *Id.* at ——. She also testified that the opportunities for exercise were extremely limited and that air circulation was very poor.

Sherlina W., another former inmate at the PSB lock-up, testified that, after her arrest, she was brought to the Public Safety Building. She stayed for 4–5 hours in a cell on the "city side." After her arraignment, she testified that she was brought back to the Public Safety Building where she was placed on the "county side." Sherlina W. testified that she was in the PSB from May 13—May 18, 1985. She described the first cell she was placed in as filthy, with food and garbage in the cell. She testified that the bathing area, with one tub and one shower, was not cleaned. No screening was performed on incoming prisoners, and no doctor was present. *Id.* at ——. Sherlina W. stated that she is a drug addict, and was suffering withdrawal symptoms, that she washed out her own laundry and wore the same clothes the entire time she was in the Public Safety Building. She testified that a warm meal was served at lunch, and that inmates also ordered out for pizza, sandwiches, potato chips, and cupcakes, which were delivered from the snack bar.

Plaintiffs introduced three exhibits. Exhibit 1, consisting of 152 pages, consists of daily records listing the female prisoners housed in the Public Safety Building from October 22, 1984 to January 30, 1985, February 8 and 11, 1985, February 18–22, 1985 and April 2—May 1, 1985. The exhibit also includes similar records for the # 7 Police Station lock-up from January 31—February 5, 1985; February 7–15, 1985, and from February 25—April 1, 1985. Plaintiffs' exhibits 2 and 3 consist of Plaintiffs' summary of female inmates detained for more than three days in the Public Safety Building, and a "Statistical Summary of Females in Police Lock-Ups" from October 20, 1984 —May 6, 1985. The accuracy of these "summaries" was disputed by Defendants.

In examining Exhibit 1, the records of the Pittsburgh Police Department, we arrived at the following figures: for female inmates at both the # 7 lock-up and the Public Safety Building lock-up:

| Number of Days in Lock-Up | Number of Inmates |
| --- | --- |
| 3 | 75 |
| 4 | 4 |
| 5 | 6 |
| 6 | 7 |
| 7 | 7 |
| 8 | 7 |

| Number of Days in Lock-Up | Number of Inmates |
|---|---|
| 9 | 5 |
| 10 | 3 |
| 12 | 1 |
| 14 | 1 |
| 15 | 1 |
| 17 | 1 |

On behalf of Defendants, Warden Kozakiewicz testified that each day, an officer of the City calls the record officer of the Jail. If the female population is under 30, prisoners are accepted from the Public Safety Building. The Warden testified that since May, 1984, the County Jail has not accepted female prisoners when the population cap is reached. Tr. at ——. The County Jail has no arrangement with the City as to the conditions in the city lock-ups.

In response to questions from the Court, the Warden testified that the County is presently using space in Clearfield, Jefferson and Indiana County Jails as it becomes available for female inmates. The Warden also testified that the 268 Center had been proposed by its operators for men only, and that the subject of female inmates had not been discussed. *Id.* at ——.

While Plaintiff's Ex. 1 includes records of female inmates being held in Police Station # 7 lock-up, we heard no testimony as to the conditions in that facility.

Several hours after the hearing, we toured the PSB lock-up after informing Mr. DiNardo of our wish to do so. We found the conditions to be consistent with the testimony presented. At the time of our tour, 1 female inmate was incarcerated on the "city" side; no female inmates were present on the "county" side. We were particularly concerned with how crowded the lock-up would have been anytime there were three or more inmates in a cell.

*Standing*

Defendants assert that the female inmates at the PSB lock-up have no standing to challenge the conditions in this lawsuit because the class in this case includes only those inmates physically present in the Allegheny County Jail. *See* Defendant's

Memorandum, at 1–2. Defendants argue that since the conditions in the PSB lock-up are separate and distinct from the original claims in this case addressed to conditions in the Allegheny County Jail, that the present claim should be pursued in a separate civil action. We find this position without merit.

Plaintiffs' Motion for Additional Relief is brought, not on behalf of "city" prisoners, but on behalf of those female prisoners who have been committed to the Allegheny County Jail, and who are being returned to the PSB lock-up because of the Warden's refusal to accept these prisoners. These prisoners are kept on the "county" side of the PSB lock-up, and hold commitment papers directed to the Warden of the Allegheny County Jail. But for the Warden's refusal to admit these female prisoners, they would certainly be "inmates of the Allegheny County Jail."

Questions of standing may involve a variety of inquiries founded in both legal and prudential concepts. *See, e.g. New Jersey Speech Language Hearing Ass'n v. Prudential Insurance Company,* 724 F.2d 383, 384–86 (3d Cir.1983); *Bowman v. Wilson,* 672 F.2d 1145, 1150–53 (3d Cir.1982). "The federal courts have abjured appeals to their authority which would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *New Jersey Speech Language Ass'n,* 724 F.2d at 385 (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982)).

In *Valley Forge,* the Supreme Court held that in order for a party to have standing, it must show that 1) it has suffered some actual injury or threatened harm; 2) which can be traced to the challenged action; and 3) which is capable of judicial redress. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. *See also Federal Deposit Insurance Corporation v. WH Venture,* 607 F.Supp. 473, 475–76 (E.D.Pa.1985) (standing criteria applied).

In this case, the female inmates allege that they are being housed under unconstitutional conditions in the Public Safety Building. As we stated before, the female inmates at issue here, being kept on the "county" side of the aisle, have judicial orders directing the Warden to hold them in the Allegheny County Jail. We believe this fact, rather than their physical presence in the jail, is determinative of whether they are members of the class in this lawsuit. We hold that female inmates being kept on the "county" side of the PSB lock-up, holding commitment papers to the Allegheny County Jail, are members of the class in this lawsuit and have satisfied the general criteria for standing. It would be ironic in the extreme if, as a result of this Court's orders regarding the maintenance of constitutional conditions in the Allegheny County Jail, persons committed to the Jail were forced to endure unconstitutional conditions elsewhere.

Our order of February 27, 1985 specifically directed Defendants to "obtain *constitutionally adequate* facilities for prisoners who would otherwise be released because of overcrowding at the jail." (emphasis added). On May 7, we found as a matter of fact that such facilities had not been obtained. We ordered a fine of $5,000 to be imposed on the County for each prisoner released.

Clearly, the Defendants' actions in refusing to accept female prisoners is an attempt to avoid the two choices open to them when prisoners are committed to the Allegheny County Jail and the population cap has been reached. Those choices are 1) to place the excess prisoners in constitutionally adequate alternate facilities; or 2) release inmates who are detained because they could not post bond, under the procedures previously specified by this Court.

We find, however, that the effect of the Defendants' actions in forcing female prisoners committed to the Jail to be returned to the Public Safety Building lock-up, is, *de facto*, to use the City lock-up as an alternate facility.

As the witnesses at the hearing testified, the lock-up was never designed to hold prisoners for any significant length of time. The facilities and staff are clearly inadequate to provide for such prolonged incarceration. There are no formal eating facilities, inadequate medical personnel, lack of hygienic facilities, and a lack of staff. Further, the return of female prisoners to the lock-up after they have been committed to the Jail only serves to exacerbate an already overcrowded situation. We are especially concerned with the lack of medical attention as evidenced from the daily reports from the Public Safety Building police logs. *See* Plaintiffs' Ex. 1, 6/3/85. As before stated, since the City lock-up is designed as a short-term holding facility pending preliminary arraignments, prisoners with medical problems can be treated on an emergency basis by EMS. Theoretically, shortly after preliminary arraignments, inmates would be released or confined in the Allegheny County Jail. On several daily report sheets, medical problems are discussed.

On January 4, 1985, a memorandum from Assistant Superintendent Howard to Superintendent Coll contained the following summary regarding a female inmate who had been incarcerated three or more days:

> This actress was taken to C.M.P. (CMC) two times yesterday. The last time, she received a prescription which was not yet filled. I will have it filled this morning. She is complaining about being pregnant, having urinary tract infection and demanding to see a gynecologist. *I recommend that this prescription be filled and given it a chance to help her.*

Plaintiffs' Ex. 1, at 46 (emphasis added).

On January 5, a report was sent from Assistant Superintendent Howard to Superintendent Coll with the following notation:

> Denise _____ (last name omitted) was sent to the hospital and received a prescription (Mercy). It was sent to C.M.C. to be filled. They would not fill Mercy's prescription. After speaking to me, Sgt. Wolfson sent it to Mercy in hope that they would fill it.

*Id.* at 47. Denise was incarcerated for more than three days in default of bond. *Id.* at 48.

We have the inherent equitable power to mold previous orders and correct wrongs which continue to persist, *Swann v. Charlotte Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971).

■ In this case, we find that the *de facto* use of the PSB lock-up to house female inmates committed to the Allegheny County Jail to be a violation of this Court's February 27, 1985 order that Defendants obtain constitutionally adequate alternate facilities by May 6, 1985. We find the conditions in the PSB lock-up clearly insufficient for the purpose of holding inmates for any significant length of time. We base our finding on the testimony as to overcrowding, lack of staff, lack of eating facilities, lack of hygienic facilities, and lack of medical and/or psychological personnel.

The female inmates on the "county" side of the PSB lock-up have been judicially committed to the Allegheny County Jail. When this occurs, they become the responsibility of the County.

Since the fall of 1984 the County has been sidestepping its responsibility to house these women in appropriate facilities. By closing the doors of the jail, the County has sought to do indirectly what it cannot do directly—that is, releasing female inmates without paying the court-imposed fine. The fine was not imposed as an *ex post facto* penalty; it was imposed in an attempt to get the County to do something to alleviate an intolerable situation. We never ordered the Defendants to create a resort hotel or luxury apartment to house prisoners. After nine years of ordering, refining, clarifying and explaining what constitutes a constitutionally adequate facility we have come to this.

It is difficult to understand how the defendants could possibly have permitted a woman committed to the Jail by a proper magisterial order to be kept in the City lock-up for seventeen days, as was the case of one of the prisoners who is the subject of this petition. This action was unconscionable.

We find Defendants' other arguments without merit.

AND NOW, to-wit, this 26th day of June, 1985, after a hearing conducted on June 3, 1985, and having considered the evidence presented at said hearing, having visited the City of Pittsburgh Lock-up in the Public Safety Building, and having considered the contentions of the parties, it is hereby ORDERED, ADJUDGED and DECREED that

1) No female prisoners committed by judicial order to the Allegheny County Jail shall be kept in any city lock-up for more than 12 hours after the execution of a valid order committing them to the Allegheny County Jail;

2) Defendants are directed to place prisoners committed to the Allegheny County Jail at times when the population cap has been met in constitutionally adequate alternate facilities; or to release such prisoners as specified under previous orders of this Court;

3) The County is directed to inform the Court of its intention to place prisoners in alternate facilities apart from other County jails, after which time a hearing will be held to determine the constitutional adequacy of such facility.