901 F.2d 1191
 INMATES OF THE ALLEGHENY COUNTY JAIL, Thomas Price Bey,
Arthur Goslee, Harry Smith, Robert Maloney, and
Calvin Milligan on their own behalf and
on behalf of all others
similarly situated
v.
Cyril H. WECHT, President of Allegheny County Board of
Prison Inspectors and the other members of the Board:
Thomas Foerster and William H. Hunt, Commissioners for
Allegheny County Eugene Coon, Sheriff for Allegheny County,
The Honorable Patrick R. Tamilia, Michael J. O'Malley and
Marion K. Finkelhor, Judges, Court of Common Pleas of
Allegheny County Richard S. Caliguiri, Mayor of the City of
Pittsburgh, Harriet McCray; Monsg. Charles Owen Rice and
Charles Kozakiewicz, Warden of the Allegheny County Jail and
William R. Robinson, Executive Director of Prison
Inspectors, and Cyril Wecht, Thomas Foerster and William H.
Hunt as Commissioners of Allegheny County, Defendants/Third
Party Defendants Appellants,
v.
The COMMONWEALTH OF PENNSYLVANIA, The Commonwealth of
Pennsylvania, Dept. of Corrections: David S. Owens, Jr.,
Commissioner, Dept. of Corrections and Erskind Deramus,
Deputy Commissioner, Dept of Corrections, Third Party Defendants.
 No. 89-3565.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 19, 1990.
Decided April 19, 1990.
 
 Caroline Liebenguth (argued), George C. Diamantopulos, Allegheny County Law Dept., Pittsburgh, Pa., for appellants.
 Donald Driscoll (argued), Neighborhood Legal Services Ass'n, Pittsburgh, Pa., for appellees.
 Before HIGGINBOTHAM, Chief Judge, BECKER and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Chief Judge.
 
 
 1
 On June 2, 1976, the inmates of Allegheny County Jail, in Pittsburgh, Pennsylvania, commenced this action challenging the constitutionality of the conditions of their confinement. In the more than thirteen years since the inmates filed their complaint, Allegheny County has consistently failed to house its inmates in compliance with the sparse and minimal commands of the Eighth Amendment. Through much of this period, Allegheny County officials have also consistently violated court orders designed to remedy severe overcrowding at the jail.
 
 
 2
 In this appeal, county officials once again ask us to set aside sanctions resulting from their violation of court orders limiting the population at the Allegheny County Jail. Because we conclude that the district court did not commit legal error or abuse its discretion in imposing these fines, we will not disturb the order imposing sanctions. However, for the reasons set out below, we must vacate the attorneys' fee award and remand for further proceedings on the inmates' fee petition.
 
 I. Background
 
 3
 The facts and procedural history of this case have been thoroughly chronicled in numerous reported decisions of the district court and this court.[1] Owens-el v. Robinson, 442 F.Supp. 1368 (W.D.Pa.1978) (holding after six week trial that conditions at jail violated Constitution in several respects); Owens-el v. Robinson, 457 F.Supp. 984 (W.D.Pa.1978) (ordering injunctive relief), aff'd in part and remanded in part sub nom. Inmates of Allegheny County v. Pierce, 612 F.2d 754 (3d Cir.1979), on remand, Inmates of Allegheny County v. Pierce, 487 F.Supp. 638 (W.D.Pa.1980) (holding after five day trial that care of mentally ill patients amounted to deliberate indifference, and ordering injunctive relief); Inmates of Allegheny County v. Pierce, 716 F.2d 177 (3d Cir.1983) (attorneys' fee appeal); Inmates of Allegheny County Jail v. Wecht, 565 F.Supp. 1278 (W.D.Pa.1983) (holding that jail conditions violated prior injunctions in several respects, and that jail overcrowding violated constitution); Inmates of Allegheny County Jail v. Wecht, 573 F.Supp. 454 (W.D.Pa.1983) (finding that county was not meeting court-imposed jail population limits, ordering restrictions on housing of federal prisoners at jail, and ordering limited release of inmates held on low bail); Inmates of Allegheny County Jail v. Wecht, 754 F.2d 120 (3d Cir.1985) (affirming district court's imposition of population limits and vacating sanctions); Inmates of Allegheny County Jail v. Wecht, 612 F.Supp. 874 (W.D.Pa.1985) (enjoining the long term detention in city lock-ups of female inmates committed to the jail); Inmates of Allegheny County Jail v. Wecht, 699 F.Supp. 1137 (W.D.Pa.1988) (finding continuing constitutional violations at jail, imposing sanctions, ordering closing of jail and submission of plans for new or alternate facilities), aff'd in part, appeal dismissed in part, 874 F.2d 147 (3d Cir.), vacated and remanded, --- U.S. ----, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989), on remand, 893 F.2d 33 (3d Cir.1990). Although our previous opinions at 754 F.2d 120 and 874 F.2d 147 describe many of the facts and proceedings relevant to the jail overcrowding issue, for the sake of clarity we will again summarize the pertinent background.
 
 
 4
 A. Jail Overcrowding Litigation: 1983 to January 1985
 
 
 5
 Since 1978, the appellants (hereafter, "defendants"[2]) have been subject to various court orders designed to remedy the unconstitutional conditions at the jail. However, this case was seven years old before the overcrowding issue became the focus of judicial attention. On May 25, 1983, the district court found that the "dangerously overcrowded" status of the Allegheny County Jail was among the circumstances that made the jail "a catastrophe waiting to happen." Inmates, 565 F.Supp. at 1281. The district court observed that overcrowding had a pervasive impact on many aspects of jail life--adversely affecting inmates' safety and physical and psychological health, restricting recreational and educational activities, decreasing the ratio of staff to inmates, and generally increasing the level of tension at the facility. Id. at 1295.
 
 
 6
 The court also noted the county's lack of interest in providing more prison space.
 
 
 7
 We take judicial notice of the fact that for years Allegheny County officials have proposed, rejected, discussed and haggled over new jail facilities; plans for new buildings have been drawn up; proposals for renovating already existing facilities have been made and rejected; other plans have been delayed in the hope that outside financial sources of assistance will be uncovered. As a result, the jail remains with us--old, dilapidated and unconstitutionally overcrowded. An economic motive can no longer excuse or be used to justify the conditions imposed on the inmates at [the Allegheny County Jail].
 
 
 8
 Id. at 1296-97.
 
 
 9
 To remedy the overcrowding, the district court on May 25, 1983 issued an order providing for the phased reduction of the jail population to 500 male and 30 female inmates by January 1, 1984. Supplemental Appendix ("Supp.App.") at 30. No appeal was taken from that order.
 
 
 10
 Although the defendants initially complied with the terms of the May 25, 1983 order, the jail population soon exceeded the court-imposed population limits. On October 20, 1983, the district court denied the defendants' motion for an extension of time to comply with the population limits and granted the inmates' motion for additional relief to ensure observance of those limits. The court stated that "[a]lthough there has been some reduction in population, the dangerously overcrowded condition of the jail is just as serious today as it was on May 25, 1983." Inmates, 573 F.Supp. at 457. The court did not impose sanctions against the defendants. Instead, it cut back on the housing of federal prisoners at the jail and ordered the defendants to meet the population cap by releasing inmates held in default of the lowest amount of bail. However, the court cautioned the defendants not to regard the release of low bail prisoners as a permanent measure. The court stated: "[i]t is the duty of the County to house prisoners, and any release of prisoners as a result of this order should be recognized as a final, albeit temporary, effort to ameliorate the situation, not as a solution to the problem." Id.
 
 
 11
 By late December 1983, twenty six inmates had been released to comply with the population limits, and the county had made no progress in obtaining interim or alternate facilities for inmates who could not be housed at the jail. On December 30, 1983, the district court issued an order providing, in part, that after February 15, 1984, the defendants would be fined $5,000 "for each prisoner released under the formula described in this Court's Order of October 20, 1983."[3]
 
 
 12
 In February 1984, the defendants moved for an increase in the population limits and permission to house inmates in refurbished jail cells and trailers. The district court denied this motion after a hearing, finding that the trailers would not provide constitutionally adequate living space for inmates, and would pose health and safety dangers.
 
 
 13
 On January 29, 1985, this court affirmed the district court's refusal to modify its injunction, stating:
 
 
 14
 The defendants made no real showing of extraordinary circumstances occurring since the entry of the May 25, 1983 injunction, from which no appeal was taken. The makeshift arrangements which they proposed in March of 1984 could have been suggested a year earlier, but were not. Instead, the defendants allowed the inmate ceilings to go into effect, while making no arrangements for alternative places of accommodation outside the jail. The County's reluctance to find such alternative accommodations is the same as it was in the spring of 1983. Meanwhile, by virtue of the ceiling on the jail population, some alleviation of the unconstitutional conditions found by the trial court occurred as a result of the May 25, 1983 injunction. As the court's findings make clear, what the defendants proposed ... was to reinstate conditions which had already been found to be constitutional violations, and to add new risks to the health and safety of inmates. We can find no clear abuse of discretion in the court's denial of the defendants' motion for such extraordinary relief.
 
 
 15
 Inmates, 754 F.2d at 127.
 
 
 16
 In the same decision, we set aside the December 30, 1983 order imposing a $5,000 fine for each prisoner released in order to comply with the population cap. We concluded that the order could not be sustained as a civil contempt sanction, as the County's release of inmates was not in violation of an existing court order. We further concluded that the order could not stand as a modification of the district court's prior injunction, since there was not a sufficient nexus between the sanction and the court's remedial objectives. We vacated the sanction with some misgivings, explaining that "[o]ur reluctance reflects our complete sympathy with the court's frustration with County Officials whose continued contumacy has aggravated a serious problem which itself was in large part a result of their inactivity." Id. at 130.
 
 B. February 1985 to May 1989
 
 17
 In response to our decision, the district court ordered the defendants to apprise it about plans for alternate facilities in order to prevent the further release of prisoners. After the district court heard testimony about the county's efforts to obtain alternate facilities, it issued a February 27, 1985 bench opinion finding that the county's response "continued to be, in essence, a stopgap approach to a serious and continuing problem." Inmates, 612 F.Supp. at 877. The district court issued an order on February 28, 1985 increasing the male population limit to 510. The court further ordered that by May 6, 1985, the defendants were "to obtain constitutionally adequate facilities for prisoners who would otherwise be released because of overcrowding at the jail." Finally, the court stated that after May 6, 1985 it would impose a $5,000 per prisoner fine "for each prisoner released because of a lack of adequate facilities." Supp.App. at 16.
 
 
 18
 On May 7, 1985, after inspecting the jail and holding a hearing, the district court found that the county was in compliance with the population limits and had "made substantial efforts to secure constitutionally adequate alternate facilities." Supp.App. at 18. However, the court noted that the county had not yet obtained such a facility. It therefore issued an order reiterating the population limit of 510 male and 30 female inmates, and commencing the $5,000 per prisoner fine described above. Id.
 
 
 19
 In mid-1985, Allegheny County began "complying" with the female population cap by simply refusing to admit female inmates to the jail once that limit was reached. Consequently, female prisoners who were committed to the jail were detained in police lock-ups that were not designed for long term use. The district court found this practice to be unconstitutional, as well as a violation of the defendants' duty under the February 27, 1985 order to secure constitutionally adequate alternate facilities. The court ordered that no female prisoners were to be held in city lock-ups for more than twelve hours after the execution of an order committing them to the jail, and further directed defendants "to place prisoners committed to the Allegheny County Jail at times when the population cap has been met in constitutionally adequate alternate facilities; or to release such prisoners as specified under previous orders of the court." Inmates, 612 F.Supp. at 884.
 
 
 20
 The defendants appealed the orders imposing fines, directing the development of a plan for new facilities, and enjoining the use of the city lockups. However, at the defendants' request, this court remanded the case to the district court for the implementation of a settlement between the parties, based on the county's completion of a 274 cell jail annex. As part of the June 1986 settlement, the district court remitted $2,090,000 in accumulated fines and vacated its February 28 and May 7, 1985 orders "insofar as they imposed fines for the release of prisoners by the Defendants." Supp.App. at 24.[4] The parties agreed that the annex would operate at full capacity--274 inmates single celled, 435 inmates double celled--by July 31, 1986, and further agreed to an increase of the population cap at the old jail to 540.[5]
 
 
 21
 As Judge Gibbons observed, "[t]he truce embodied in the June 4, 1986 stipulation proved to be, like the Lebanese variety, of short duration." Inmates, 874 F.2d at 151. In early 1988, the parties returned to district court--the defendants seeking an order lifting the population limits and the inmates moving for sanctions and additional relief from the conditions at the old jail and the overcrowding at the annex. In its February 9, 1988 memorandum order, the district court found that "the population caps are not being followed at the Allegheny County Jail or at the Jail Annex." Supp.App. at 43. The court directed the defendants to meet the population limits at the two facilities first by releasing inmates in the work release program, and then by releasing low bail inmates pursuant to the terms of its prior order. However, the district court denied the inmates' motion for sanctions "subject to further review by [the] Court." Supp.App. at 47.
 
 
 22
 The legal sparring continued in the following months, with the inmates again moving for sanctions because of the defendants' violations of the population limits, and the defendants again moving to increase the jail's population cap. On November 17, 1988, after two days of hearings and a visit to the jail and the annex, the district court again found that the jail's population limit was being regularly exceeded. On the basis of a comprehensive survey of conditions at the jail, and expert projections about the future demands on Allegheny County's correctional system, the court concluded that the jail could not provide constitutionally adequate housing to Allegheny County's inmates. It therefore ordered that no inmates be housed at the facility after June 30, 1990. The court further ordered the defendants to submit a plan by May 1, 1989 for the housing of at least 900 inmates, not including the 435 inmates at the annex. The court also granted in part the inmates' motion for sanctions, stating:Because the defendants have repeatedly violated earlier Orders of this Court relative to population and medical care without seeking permission of this Court, we believe that financial sanctions are warranted and will grant the plaintiffs' petition in part.
 
 
 23
 The defendants will be fined $25,000 for failure to comply with this Court's orders. The same fine will be imposed for each month in the future that applicable limits are exceeded.
 
 
 24
 Inmates, 699 F.Supp. at 1148.
 
 
 25
 On May 4, 1989, this court affirmed the order closing the jail, and dismissed the defendants' appeal of the order requiring them to submit a plan for new or alternate facilities. We held that monetary sanctions were warranted by the defendants' continuing non-compliance with the district court's remedial orders. Inmates, 874 F.2d at 152.[6]
 
 C. May 1989 to July 1989
 
 26
 After our decision was filed, the focus of this litigation shifted to the district court. On May 1, 1989, in compliance with the district court's November 17, 1988 order, the defendants submitted the "Allegheny County Criminal Justice Plan," which set forth the county's proposal for new or alternative housing for 900 inmates. At a June 12, 1989 hearing on the plan, the court heard testimony from Lynette Norton, the court-appointed jail monitor, concerning the county's use of Mayview State Hospital ("Mayview") to house persons arrested during anti-abortion protests in Allegheny County.
 
 
 27
 Previously, the court had scheduled a hearing for June 26, 1989 to allow the defendants to show cause why the court should not impose sanctions for the ongoing violations of the jail population limits. On June 21, 1989, the district court issued an order directing the defendants and the third party defendant Commonwealth of Pennsylvania to explain at that hearing the circumstances surrounding the detention of abortion protesters at Mayview.
 
 
 28
 At the parties' request, the hearing on sanctions was postponed to July 17, 1989. In the interim, on July 7, 1989, the district court approved a stipulation concerning the continued use of the county jail. As part of this settlement, the county agreed to make various repairs, renovations, and staffing and programmatic improvements at the jail. The parties agreed to a June 30, 1992 deadline for the replacement or renovation of the Allegheny County Jail. For their part, the inmates withdrew their motion for sanctions, waived their right to request sanctions for any violations of court orders "up through the date of the filing of [the] stipulation", and "join[ed] the Defendants in requesting that [the] Court not impose any sanctions whatsoever on the Defendants for alleged Constitutional violations up through the date of the signing of this stipulation." Appendix ("App.") at 46-50.
 
 
 29
 In its order approving the parties' stipulation, the district court stated that "[n]o sanctions will be applied for the period November 17, 1988 to the date of this Order." The court added, however, that it would "consider sanctions from this date forward any time that the population cap previously set is exceeded and, as well, any time that inmates are released because of overcrowding." App. at 51.
 
 
 30
 At the July 17, 1989 hearing on sanctions, the district court heard testimony concerning the housing of abortion protesters at Mayview from Ms. Norton, the jail monitor; Charles J. Kozakiewicz, the Warden of the Allegheny County Jail; Robert Nelkin, the Executive Assistant to Allegheny Commissioner Thomas Foerster; and Shirley Dumpman, the Acting Director of the Department of Public Welfare's Western Area Office of Mental Health.
 
 
 31
 The testimony revealed that plans for the use of Mayview to house abortion protesters began in mid-January 1989, when county authorities feared mass arrests at anti-abortion protests to be held in the area. According to Mr. Nelkin, both Commissioner Foerster and Warden Kozakiewicz were directed by a state court judge, on threat of contempt, to detain arrested protesters. Allegheny County and Pittsburgh officials conferred about several possible sites for the temporary detention of arrestees, ultimately securing permission from the state to use Mayview for that purpose. However, because police were able to negotiate a peaceful resolution of the January protests, the hospital was not used at that time.
 
 
 32
 County officials faced a similar crisis on March 11, 1989, when ninety nine protesters, fifty females and forty nine males, were arrested following anti-abortion protests in the area. Warden Kozakiewicz testified that he was told by the state court judge: "Warden, you will accept those prisoners or you will be held in contempt and you will be an inmate in your own jail." App. at 533. The female protesters were taken to the jail, where they were held overnight in the facility's gymnasium. The male protesters were detained overnight by the Pittsburgh police. On March 12, after again securing permission from the state to use Mayview to house arrestees, all of the protesters were transferred to the hospital. The protesters were released by the evening of March 12, after they identified themselves to police and were given citations.
 
 
 33
 On June 18, 1989, abortion protesters were again arrested by the Pittsburgh police and were again housed at Mayview. According to the warden, from June 18 through 27, forty protesters, nineteen males and twenty one females, were detained at the state hospital.
 
 
 34
 Ms. Norton testified that during the periods when abortion protesters were housed at Mayview, the population at the Allegheny County Jail consistently exceeded the population caps, even after the release of work release and low bail inmates.[7]
 
 
 35
 Immediately after the July 17 hearing, the district court issued a memorandum order reimposing fines against the County for the violation of the jail population limits. The court explained that it was taking this action as a result of the county's housing of abortion protesters in Mayview, at a time when the prison's population cap was being exceeded, work release inmates were being sent home, and low bail inmates were being released. The court stated:
 
 
 36
 The tragic irony of this situation is apparent to anyone having the patience to think it through. Inmates charged with crimes are summarily released on Cohill bonds;[8] others are kept at the jail on orders of the Warden (and with the concurrence of the Commissioners) in admitted violation of this Court's orders; if you were an abortion protester in March or June of 1989 you got special treatment.
 
 
 37
 The whole situation doesn't make sense, but it does establish the fact that the County can move fast when the 'right' crisis develops.
 
 
 38
 App. at 573. The district court ordered the following sanctions, commencing August 1, 1989.
 
 
 39
 1. For any month in which the population cap at the Allegheny County Jail is exceeded, the County of Allegheny will be fined the sum of $25,000, payable to the Clerk of Court thirty days after the end of the month in which the population cap was exceeded.
 
 
 40
 2. For each prisoner released in an attempt to meet the court-ordered population cap, and for each work-release prisoner who is permitted to return home at night instead of being kept in jail, the County of Allegheny will be fined the sum of $100 payable to the Clerk of Court thirty days after the end of the month in which the prisoner was released.
 
 
 41
 App. at 573-74.
 
 
 42
 On July 17, 1989, inmates' counsel filed a motion seeking $23,272.50 in counsel fees related to recent litigation in this matter. On July 19, 1989, the district court entered an order, without opinion, awarding $23,185.00 in counsel fees to the inmates.
 
 
 43
 The defendants now appeal the district court's July 17, 1989 order imposing sanctions and its July 19, 1989 order awarding attorneys' fees.
 
 II. Discussion
 A. July 17, 1989 sanction order
 
 44
 Although the district court did not state whether it intended its July 17, 1989 order to be a civil contempt sanction, it is clear from the circumstances that the order is most properly characterized as a coercive civil contempt order entered in a post-permanent injunction proceeding. See Latrobe Steel Corp. v. United Steelworkers, 545 F.2d 1336, 1344 (3d Cir.1976) (Coercive civil contempt sanctions "are designed to aid the plaintiff by bringing a defiant party into compliance with the court order or by assuring that a potentially contumacious party adheres to an injunction by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience.") The sanction order is therefore reviewable under 28 U.S.C. Sec. 1291.[9]
 
 
 45
 A court has the "inherent power to enforce compliance with [its] lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966). However, as the Supreme Court recently emphasized, the contempt power is not without limits, particularly when directed against governmental defendants.
 
 
 46
 "[T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." Milliken v. Bradley, 433 U.S. 267, 280-281, 97 S.Ct. 2749, 2758-59, 53 L.Ed.2d 745 (1977). And the use of the contempt power places an additional limitation on a district court's discretion, for ..., "in selecting contempt sanctions, a court is obliged to use the 'least possible power adequate to the end proposed.' " United States v. City of Yonkers, 856 F.2d [444,] 454 [2d Cir.1988] (quoting Anderson v. Dunn, [19 U.S. (6 Wheat.) 204, 231, 5 L.Ed. 242 (1821) ].
 
 
 47
 Spallone v. U.S., --- U.S. ----, 110 S.Ct. 625, 632, 107 L.Ed.2d 644 (1990).
 
 
 48
 Two of our previous opinions in this case provide a useful starting point for the present analysis. In our 1985 decision, we vacated the district court's order imposing a $5,000 fine for each inmate released to meet the population limits. We noted that although the defendants were fully aware of the court's wish that the defendants resolve the county's jail overcrowding crisis without releasing prisoners, the court's wish could not be given the effect of a specific order prohibiting the release of inmates. We stated that the specificity requirement of Fed.R.Civ.P. 65(d) is designed to ensure that "[p]ersons may not be placed at risk of contempt unless they have been given specific notice of the norm to which they must pattern their conduct." Inmates, 754 F.2d at 129. Under the terms of the May 25, 1983 order, we observed,
 
 
 49
 the County defendants were free to do what they are doing: release prisoners in order to comply with the population limits in the jail. They were not given any specific direction to prepare and implement an alternative plan for housing inmates. Thus they cannot be held in civil contempt for failing to do so, however irresponsible that failure may be.
 
 
 50
 Id.
 
 
 51
 In our 1989 decision, we affirmed the district court's $25,000 contempt sanction against the county defendants for prior violations of its remedial orders, and its $5,000 sanction for defendants' failure to pay its fine on time. We noted then that the scope of our review of an order imposing contempt sanctions for prior violations of an injunction "is limited to these questions: did the order give fair notice, was the contempt hearing procedurally proper, did contemnors violate the order, and was compliance with the order physically possible." 874 F.2d at 152, citing Halderman v. Pennhurst State School & Hospital, 673 F.2d 628, 636-37 (3d Cir.1982), cert. denied, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).
 
 
 52
 The court determined that the contempt sanction satisfied these criteria, summarily rejecting the defendants' assertions that the district court's sanctions were an improper remedy.
 
 
 53
 The orders in question were directed to all the defendants, and the suggestion that it was physically impossible for Allegheny County to obey the order in the respects in which they were held to be in contempt is sophistical. The County officials simply chose to take no steps to provide the Warden and his staff with the wherewithal to comply. Such conduct exposes the party responsible to contempt.
 
 
 54
 Alternatively, the County contends that the fine was not a proper civil remedy since it is not remedial. That argument is no more persuasive than the County's reliance on the defense of impossibility. More was at stake than merely vindicating the dignity and authority of the court. The orders which were disobeyed are still in place, and the district court imposed the fines for the clear purpose of deterring their violation in the future.
 
 
 55
 874 F.2d at 152 (citations omitted).
 
 
 56
 We conclude that the district court's July 17, 1989 sanction order satisfies the standards enunciated in these cases. There is no suggestion that the July 17, 1989 hearing was procedurally improper. Likewise, there is no dispute that in the months preceding the imposition of sanctions, the defendants were in violation of the court order imposing a 540 inmate population limit at the Allegheny County Jail. App. at 62-71, 522-27. Like the order under appeal in 1985, the district court's sanction order was clearly designed to coerce the county into spending the funds needed to develop and implement a plan for alternative, constitutionally adequate housing for inmates. However, unlike the situation we faced in 1985, and like the situation we encountered last year, the district court's sanctions were imposed on the basis of explicit prior orders that put the defendants clearly on notice as to proscribed conduct and penalties. The district court's November 17, 1988 order warned the defendants that they would be subject to a $25,000 monthly fine "for each month ... that applicable [population] limits are exceeded." Inmates, 699 F.Supp. at 1148. The defendants also had specific notice that the early release of inmates was an unacceptable substitute for securing constitutionally adequate jail facilities, and that the continuation of this stopgap measure would subject the defendants to sanctions. The district court stated in its July 7, 1989 order that it would "consider sanctions from this date forward any time that the population cap previously set is exceeded and, as well, any time that inmates are released because of overcrowding." App. at 51.
 
 
 57
 We are sympathetic to the plight of those Allegheny County officials who were caught in the no-win situation of trying to comply with a federal court order limiting the jail population, while also trying to satisfy a state court judge who was understandably insistent on the detention of a large group of arrested protesters. However, the defendants' argument that it was physically impossible for them to comply with the court-ordered population limits represents a deficient and short-sighted view of impossibility. The Warden and others involved in the detention of the abortion protesters were placed in their difficult position simply because Allegheny County's governing officials have consistently failed to comply with longstanding court orders directing them to provide constitutionally adequate housing for inmates. As we cautioned last year, and continue to hold, this type of conduct exposes the responsible parties to contempt. Inmates, 874 F.2d at 152.
 
 
 58
 Finally, the defendants assert that the district court abused its discretion in imposing fines as a result of the county's detention of abortion protesters. Although we have some reservations about the sequence of events leading up to the July 17, 1989 order, we conclude that the district court acted within its discretion in imposing coercive sanctions. The reported decisions in this action chronicle Allegheny County's consistent failure to meet its meager Eighth Amendment obligations, and document the defendants' chronic non-compliance with the district court's remedial orders. Given this background, the district court was justified in concluding that the imposition of substantial monetary sanctions was necessary to compel adherence to its lawful orders, and that these sanctions represented the exercise of "[t]he least possible power adequate to the end proposed." Anderson v. Dunn, 19 U.S. (6 Wheat.) 93, 105 (1821).
 
 B. July 19, 1989 Attorneys' Fee Award
 
 59
 On July 17, 1989, inmates' counsel submitted a petition for attorneys' fees in the amount of $23,272.50. Two days later, on July 19, 1989, the district court issued an order awarding $23,185.00 in fees. The defendants contend, and the inmates do not dispute, that the defendants did not have an opportunity to contest the fee petition or to object to the hours claimed. Indeed, defendants' counsel asserts that he received his adversary's fee petition on the same day that the district court entered the fee award.
 
 
 60
 The procedure employed by the district court violates at least two fundamental precepts of our attorneys' fee jurisprudence. First, the court did not afford the defendants the opportunity to review and contest the fee petition. This court has held that "[d]isputes over awards of attorneys' fees ... must be resolved in a manner which affords the parties an opportunity for a hearing to present evidence on disputed issues of fact as to what hours should be included in the lodestar amount." Cunningham v. City of McKeesport, 753 F.2d 262, 266-67 (3d Cir.1985), vacated and remanded on other grounds, 478 U.S. 1015, 106 S.Ct. 3324, 92 L.Ed.2d 731 (1986), reinstated, 807 F.2d 49 (3d Cir.1986), cert. denied, 481 U.S. 1049, 107 S.Ct. 2179, 95 L.Ed.2d 836 (1987). Second, the district court did not state the basis of its fee determination. This court has cautioned that a district court may abuse its discretion in awarding attorneys fees when it "uses improper standards or procedures in determining fees, or if it does not properly identify the criteria used for such determination." Silberman v. Bogle, 683 F.2d 62, 65 (3d Cir.1982) (emphasis added). We find that the district court's summary procedure represents an abuse of discretion, as the present record provides us with no basis for intelligent review of the district court's award. Accordingly, the July 19, 1989 fee award will be vacated.
 
 III.
 Conclusion
 
 61
 For the foregoing reasons, the district court's order of July 17, 1989 imposing sanctions will be affirmed and its order of July 19, 1989 awarding attorneys' fees will be vacated. The matter will be remanded for further proceedings on the attorneys' fees matter.
 
 Inmates Released Population
 
 62
 Date Work Release Low Bail over Cap
 
 
 63
 3/11/89 24 31 14
 
 
 64
 3/12/89 24 9 19
 
 
 65
 6/18/89 23 13 39
 
 
 66
 6/19/89 22 7 16
 
 
 67
 6/20/89 22 11 22
 
 
 68
 6/21/89 23 7 23
 
 
 69
 6/22/89 23 23 8
 
 
 70
 6/23/89 24 13 6
 
 
 
 [1]
 Rather than adopt separate nomenclature for each published opinion in this case, we shall cite the various decisions simply by reference to the reporter volume and page number
 
 
 [2]
 The third party defendant, the Commonwealth of Pennsylvania, is not participating in this appeal. References to "defendants" refer to the Allegheny County defendants, and not to the Commonwealth of Pennsylvania
 
 
 [3]
 The full text of the court's order is set out at Inmates, 754 F.2d at 124 n. 2
 
 
 [4]
 The terms of the June 4, 1986 stipulation are set out in our 1989 decision. Inmates, 874 F.2d at 151
 
 
 [5]
 At the parties' request, we dismissed the defendants' appeals on June 11, 1986
 
 
 [6]
 On November 6, 1989, the Supreme Court vacated and remanded this court's judgment for further consideration in light of University of Texas v. Camenisch, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). --- U.S. ----, 110 S.Ct. 355, 107 L.Ed.2d 343 (1989). On January 8, 1990, following briefing from the parties, we in turn remanded the case to the district court with a direction that the district court vacate its order to close the old jail. We explained:
 We are now advised that on July 7, [1989,] after our judgment but before the Supreme Court granted certiorari, the parties entered into a stipulation under which Allegheny County is relieved of the obligation to build a new jail if it significantly improves the old one. That stipulation was entered by the district court as an order. Thus, it appears that the stipulation renders moot the parties' dispute over the power of the district court to order the closing of the old jail, since it effectively supersedes the order which we affirmed.
 893 F.2d 33, 34 (3d Cir.1990).
 The parties agree that the Supreme Court's order has no bearing on the issues raised in the present appeal. As the defendants point out in their memorandum of December 20, 1989, the Supreme Court's order deals with the distinct issue of "whether the District Court exceeded its remedial authority in ordering the closing of the existing jail and submission of a plan for construction of a new jail."
 Our remand to the district court left intact the part of the district court's order imposing sanctions for noncompliance with the jail population limits.
 
 
 [7]
 Ms. Norton testified that on the dates in question, the following numbers of work release or low bail inmates were released, and the jail population was in excess of its 540 inmate limit by the following amounts,
 App. at 522-25.
 
 
 [8]
 A "Cohill bond" (named for the district judge) is the unfortunate and inapt term given by the Pittsburgh-area media for the court-ordered release of inmates held in default of lowest amount of bail. It should be clear by this point that low bail inmates are being released solely because Allegheny County has failed to provide constitutionally adequate housing for its inmates. By this point, it should also be clear to anyone familiar with this case that it is not the district judge's wish that inmates be set free because of overcrowded conditions at the Allegheny County Jail
 
 
 [9]
 We faced a similar situation, and reached a similar result on the appellate jurisdiction issue, in our 1985 decision. Inmates, 754 F.2d at 128